**WINTERS COAL CO., INC., Petitioner-Appellant-Cross Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee-Cross Appellant.**

**No. 73-1077.**

United States Court of Appeals,
Fifth Circuit.

July 5, 1974.

John Y. Merrell, McLean, Va., Wentworth T. Durant, Dallas, Tex., H. A. Street, Grundy, Va., for petitioner-appellant-cross appellee.

Scott P. Crampton, Asst. Atty. Gen., Tax Div., U. S. Dept. of Justice, Washington, D. C., Lee H. Henkel, Jr., Chief Counsel, Raymond W. Sifly, Internal Revenue Service, Washington, D. C., Wesley J. Filer, Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee-cross appellant.

Before BELL, COLEMAN and RONEY, Circuit Judges.

COLEMAN, Circuit Judge:

This is an appeal from an order of the United States Tax Court denying petitioner's request for a redetermination of a deficiency in its taxes for its taxable years ending March 31, 1965 and 1966, as assessed by the Commissioner of Internal Revenue. The primary issue is: Did the Tax Court err when it held that the taxpayer, Winters Coal Co., Inc., had no economic interest in the coal in place, mined under a lease with Alabama By-Products Corporation, which would have entitled Winters to a deduction for percentage depletion under Sections 611 and 613 of the Internal Revenue Code, 26 U.S.C. § 611 and § 613? The answer moots the other issues raised by the appeal and the cross appeal.

This case was tried upon stipulated facts; therefore, only questions of law are presented by the appeal. The Tax Court denied the depletion allowance, a judgment which we find must be reversed.

Analyzing the Commissioner's argument in its basic essentials, he contends that although Winters has a valid lease for the minerals and mining rights on particular pieces of property, it does not have the required economic interest in the coal in place to allow it to claim the percentage depletion simply because the lease was terminable on short notice.

The cogent clauses of the leases [1] provided that ABC, as lessor, for the con-

1. There were two leases actually executed between the petitioner and ABC, one on December 1, 1959, and another on August 31, 1964. Both of the documents contained virtually the same language and provisions except those discussed later in the text of the opinion.

sideration and subject to the terms and conditions of the lease, did "demise and let" to the lessee, P. L. Winters,[2] certain specified lands for the purpose of removing by the strip mining method coal from the "Black Creek" seam.

Beside the normal boiler-plate clauses,[3] the other pertinent clauses involved the payment of royalties to ABC, the termination of the leases, and certain requirements concerning surface rights. The clauses dealing with the royalty payments provided that the petitioner would pay ABC $.50 a ton with a minimum of $50.00 per month on the coal mined from property ABC owned in fee simple; otherwise, where ABC owned only the mineral and mining rights, the royalty was $.40 per ton with no minimum monthly payment.

As for the termination of the lease, the pertinent clauses show that it was automatically renewable every year, and, in order to terminate, the party wishing to do so had to give the other 30 days notice of intent. The all-important clause here, according to the Commissioner, was a clause giving either party the right to terminate the lease *at will* upon 60 days notice. This 60 day requirement was reduced to 30 days in the second lease.

The lease also contained a provision requiring the lessee to obtain rights from the surface owner before the lease could become effective.

In addition to the aforementioned clauses, another important proviso of the lease should be mentioned:

"It is understood that we make no representation or warranty whatsoever that there is any coal in the above described lands, that any coal therein is mineable or merchantable, that any coal therein, if mineable or merchantable, would be suitable for our use, or that we shall purchase any coal mined from said lands."

In February of 1958, apparently before the first lease, Mr. Winters and ABC entered into a contract whereby Mr. Winters would sell to ABC 100 tons of coal per day for its coking operations. The contract price varied somewhat during the tenure of the contract but was originally set at $5.50 a ton.

As previously mentioned, this case involves a claim for a percentage depletion allowance under Sections 611[4] and 613[5]

2. Winters Coal Co., Inc., was formed as an Alabama Corporation in 1964 to engage in a coal mining business which had been operated previously as a sole proprietorship by P. L. Winters. It was assumed by the parties that the leases and contracts held by Mr. Winters were assigned to the corporation upon its commencement and thereafter acted for the company in its contractual negotiations.

3. These clauses contained provisions regarding the payment of taxes, indemnity of the lessor, the lessee as an independent contractor, and the effectiveness of the lease on property which ABC owned only the mineral and mining rights.

4. 26 U.S.C. § 611. *Allowance of Deduction for Depletion.*
"(a) *General Rule.*—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. For purposes of this part, the term 'mines' includes deposits of waste or residue, the extraction of ores or minerals from which is treated as mining under section 613(c). In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this section for subsequent taxable years shall be based on such revised estimate."

5. 26 U.S.C. § 613. *Percentage depletion.*
"(a) *General Rule.*—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the

of the Internal Revenue Code of 1954. Section 611 provides that in the case of mines there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion in accordance with regulations prescribed either by the Secretary of the Treasury or his delegate, the Commissioner of Internal Revenue. According to Section 613, the petitioner would be entitled to claim a 10% deduction from his gross income.

Pursuant to the power granted by section 611(a), the Commissioner has promulgated certain regulations to determine when one can claim the allowable deduction. In this opinion we are primarily concerned with one such regulation and its interpretation in light of the facts of the case at bar. It provides the following:

> "(b) *Economic interest.* (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possess [sic] a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest. Further, depletion deductions with respect to an economic interest of a corporation are allowed to the corporation and not to its shareholders."

Treas.Reg. § 1.611–1(b) (1965).

In essence we are called upon to determine whether Winters Coal acquired an economic interest in the minerals in place. This necessitates a determination of what interest, if any, was obtained by Winters, and, when viewed in light of the United States Supreme Court decisions on the point, whether the short notice terminability provisions of the leases are sufficient in themselves to reduce Winters' interest to a mere economic advantage, and if so, whether the acquisition of surface rights was sufficient to create an economic interest as required by the law.

The writer of this opinion would ground the decision of this case on the lease alone, as developed under the following Part I of this opinion. The majority of the panel consisting of Judges Bell and Roney are concerned, however,

property (computed without allowance for depletion). For purposes of the preceding sentence, the allowable deductions taken into account with respect to expenses of mining in computing the taxable income from the property shall be decreased by an amount equal to so much of any gain which (1) is treated under section 1245 (relating to gain from disposition of certain depreciable property) as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231, and (2) is properly allocable to the property. In re case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section.

"(b) *Percentage Depletion Rates.*—The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

\*     \*     \*     \*     \*

"(4) 10 percent—asbestos (if paragraph (2)(B) does not apply), brucite, coal, lignite, perlite, sodium chloride, and wollastonite.

\*     \*     \*     \*     \*

"(c) *Definition of Gross Income From Property.*—For purposes of this section—

"(1) *Gross income from the property.*—The term 'gross income from the property' means, in the case of a property other than an oil or gas well, the gross income from mining."

that the one-year lease terminable at will by either party on 30 days notice might be a mere usufruct as compared to the lease in Lynch v. Alworth-Stephens Co., 267 U.S. 364, 45 S.Ct. 274, 69 L.Ed. 600 (1925), and did not, standing alone, convey an economic interest under the Treasury Regulations, Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933), and Parsons v. Smith, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959). They find all doubts as to the requisite economic interest resolved, however, by the requirement in the lease that the taxpayer acquire surface rights and the acquisition of those rights by the taxpayer, following the authority of Commissioner v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L. Ed. 347 (1956), as developed in Part II of the opinion prepared by the majority members of the panel.

### I. *The Lease*

The Alabama Supreme Court has been called upon to determine the validity of a lease quite similar to the one now under consideration.[6] In Adams v. Riddle, 233 Ala. 96, 170 So. 343 (1936), Judge Bouldin, speaking for that Court, held that the lease there in question gave the lessee a possessory interest in the land by conveying to him ownership of the minerals.

> "All the cases agree that such a lease passes a property right in the minerals, the right to locate, sever, and convert to personalty."

170 So. at 345.

There is little conflict or disagreement with the old hornbook principle that a lease is a conveyance and creates in the lessee an estate which entitles him to exclusive possession unless certain rights are reserved by the lessor. Moynihan, Introduction to the Law of Real Property, 63–85, (1962).

We believe that the case of Lynch v. Alworth-Stephens Co., 267 U.S. 364, 45 S.Ct. 274, 69 L.Ed. 660 (1925), is controlling on the issue of a lease transferring an economic interest. There the Court held:

> "It is, of course, true that the leases here under review did not convey title to the unextracted ore deposits (United States v. Biwabik Mining Co., 247 U.S. 116, 123, 38 S.Ct. 462, 62 L.Ed. 1017); but it is equally true that such leases, conferring upon the lessee the exclusive possession of the deposits and the valuable right of removing and reducing the ore to ownership, created a very real and substantial interest therein. See Hyatt v. Vincennes Bank, 113 U.S. 408, 416, 5 S. Ct. 573, 28 L.Ed. 1009; Ewert v. Robinson, 10 Cir., 289 F. 740, 746–750. And there can be no doubt that such an interest is property. Hamilton v. Rathbone, 175 U.S. 414, 421, 20 S.Ct. 155, 44 L.Ed. 219; Bryan v. Kennett, 113 U.S. 179, 192, 5 S.Ct. 407, 28 L. Ed. 908."

As to the short notice terminability effect on the lease, the U. S. Court of Claims, in a case on all fours with the one at bar, held that "the property in-

---

6. The sections having pertinence to the case at bar are as follows:

"Parties of the first part, in consideration of the sum of one dollar and other valuable consideration do hereby grant, demise and let unto the party of the second part and assigns, all the minerals in and under the following described tract of land, and also the said tract of land for the purpose and with the exclusive right of mining and operating thereon, also such other provisions as are necessary for conducting said operations (then follows a description of the tract, 1360 acres).

"To have and to hold the same unto the party of the second part, his heirs and as-

signs, for the term of five (5) years from date hereof and as much longer as minerals are found in paying quantities thereon, allowing and paying to the party of the first part as Royalty 10% of all monies received from sale of such minerals; payments to be made within 30 days after shipments are marketed.

"Lessee agrees to enter upon said lands and begin operation within sixty days from date hereof. It is further agreed that failure to operate for sixty consecutive days without the consent of lessor shall act as forfeiture."

terest . . . is not varied or diminished simply because the authority is subject to the possibility of extinction in the future by a termination of the leases on short notice". Bakertown Coal Co., Inc. v. United States, 485 F.2d 633 (Ct. Cl., 1973).

Akin to this short notice clause is a tenancy terminable at will.

"An estate at will is an estate which is terminable at the will of either landlord or tenant and has no other specified perior of duration. Such a tenancy is properly an estate since the tenant has an exclusive right to possession and may maintain an action of trespass or ejectment against persons interfering with his possessory interest."

Moynihan, *supra*, at 83.

Applying these precedents to the lease now under consideration, the writer of this opinion sees no room for doubt that the lease did convey to Winters the leasehold rights to the coal in place. This reduces us to the issue of whether the short notice terminability provisions denigrate a valid conveyance to a mere economic advantage.

The Supreme Court in Parsons v. Smith, 359 U.S. 215, 79 S.Ct. 656, 3 L. Ed.2d 747 (1959), first examined and rejected the depletion claims of mining contractors who contended that:

". . . their contractual right to mine coal from the designated lands and the use of their equipment, organizations, and skills in doing so, should be regarded as the making of a capital investment in, and the acquisition of an economic interest in, the coal in place."

359 U.S. at 224. In its holding, the Court enumerated seven factual bars to entitlement, as follows:

"To recapitulate, the asserted fiction is opposed to the facts (1) that petitioners' investments were in their equipment, all of which was moveable —not in the coal in place; (2) that their investments in equipment were recoverable through depreciation—not depletion; (3) that the contracts were completely terminable without cause on short notice; (4) that the landowners did not agree to surrender and did not actually surrender to petitioners any capital interest in the coal in place; (5) that the coal at all times, even after it was mined, belonged entirely to the landowners, and that petitioners could not sell or keep any of it but were required to deliver all that they mined to the landowners; (6) that petitioners were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for each ton mined and delivered, which was, as stated in Huss [v. Smith] [255 F.2d 599, 600], agreed to be in 'full compensation for the full performance of all work and for the furnishing of all [labor] and equipment required for the work'; and (7) that petitioners, thus, agreed to look only to the landowners for all sums to become due them under their contracts."

359 U.S. at 225.

The important distinction in these cases is that which exists between a mere contractor who removes the coal and a sublessee who has a leasehold interest before removal and owns the product after removal. This appears abundantly clear from the decision of the Supreme Court in Paragon Jewel Co. v. C. I. R., 380 U.S. 624, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965) and the decision of this Court in United States v. Wade, 5 Cir., 1967, 381 F.2d 345.

We have been unable to find any case, other than a Tax Court decision,[7] in which the courts have held that a valid lease failed to convey an economic interest solely because one of the parties could terminate the arrangement on short notice. A careful scrutiny of the cases cited by the Commissioner reveals that these cases involved contracts merely for the removal of coal and not a

---

7. Bolling v. C. I. R., 37 T.C. 754 (1962).

lease of the minerals in place such as we have here.

Taking the seven point criteria as enumerated by the Supreme Court and applying them to the case at bar, we hold as to five of them:

(2) That this investment could not be recovered by depreciation; thus leaving only depletion;

(3) That the leases were terminable on short notice;

(5) That the coal at all times, even after it was mined, belonged entirely to the petitioner, and that he could sell or keep any of it and was not required to deliver all that was mined to the lessor—although as a matter of fact, it did sell all that was mined from these lands to the lessor;

(6) That the petitioner was to have all of the proceeds of the sale of the coal; and

(7) That petitioner, thus, did not agree to look only to the lessor for all income.

As to (1) and (4) of the seven criteria under *Parsons*, Judges Bell and Roney are uncertain that the lease, terminable on short notice, by itself, constituted a capital investment in the coal in place or a surrender by the owner of a capital interest in the minerals, and would not decide that point in this case. The opinion writer would hold, however, that the lease constituted an investment by the taxpayer in the coal in place, and a surrender to petitioner of a capital interest in that coal by the owner, and would reach the inescapable result that the only point in the Commissioner's favor is the short notice termination clause. This being the only contra point to the vesting of an economic interest in the petitioner, to say that ABC had not passed an economic interest to Winters pursuant to the leases gallops beyond all reason and logic.

## II.  *Surface Rights*

The majority of the Court have no difficulty in deciding that the acquisition of surface rights by the taxpayer, coupled with the lease which requires such acquisition, was sufficient in the aggregate to constitute an economic interest for depletion purposes. The lease provided:

In the event the Lessor is the owner of the minerals and mining rights only in the above described lands the rights herein granted shall be limited to such as the Lessor has in connection with the mining of said coal, and this lease shall not be effective unless and until an appropriate lease or release, acceptable to Lessor has been obtained from the surface owner by the Lessee and furnished to Lessor. In the event of any dispute as to the ownership of or rights in any surface lands leased hereunder, or as to the ownership of or extent of the mineral and mining rights in any lands leased hereunder, the Lessee shall discontinue the use of said surface or of said mineral, either or both, as the case may be, until such dispute shall have been settled.

The cost of the various surface rights was substantial. No leases are involved that did not require the acquisition of the surface.

Commissioner v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956), involved the relative rights in the depletion allowance of the lessee of an offshore oil tract and the owners of the land from which the lessee slant drilled to develop the deposit. State law permitted extraction of offshore oil only by slant drilling from upland drill sites and the lease from the State provided accordingly. The Supreme Court held that the upland owners were entitled to deplete their contractual interest in the drilling company's net profits from the tract. The Court pointed out that the state law requirement that the driller obtain the use of upland drilling sites made the upland owners indispensable parties to produc-

tion of offshore oil. The Court found that the upland owners acquired an economic interest in the oil in place by contributing the use of their indispensable real estate. The Court noted that the value of their land adjacent to the offshore oil tract, which had been increased by its potential use in oil production, was reduced by each barrel of oil extracted.

The case at bar is factually close to *Southwest Exploration*. Coal could only be extracted from ABC's deposits by stripmining. The law of real property required the permission of the surface owners before the overburden could be removed to reach the coal. The lease, according to its terms, did not become effective until taxpayer had obtained that permission. Like *Southwest Exploration*, state law and the leasing arrangement required that the producer cooperate with certain property owners. Once the taxpayer had acquired the interests it purchased from the surface owners, it was in the same position as the upland property owners in *Southwest Exploration*. It became an indispensable party to the exploitation of ABC's coal. Use of the land was not only legally indispensable as in *Southwest Exploration*, but physically essential. Neither ABC nor any other party could extract the coal without taxpayer's permission to remove the overburden. Moreover, as in *Southwest Exploration*, the value of the essential land reflected its indispensability, and its value decreased as the underlying mineral wealth was extracted.

### III. *Conclusion*

In summary, albeit by different routes, this Court is unanimous in the decision that the taxpayer is entitled to claim depletion on its interest in the leased coal deposits. Accordingly, the judgment of the Tax Court is

Reversed.