UNITED STATES *v.* SWANK ET AL.

No. 79–1515. Argued December 9, 1980—Decided May 18, 1981

572

Stevens, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Marshall, Blackmun, Powell, and Rehnquist, JJ., joined. White, J., filed a dissenting opinion, in which Stewart, J., joined, *post*, p. 585.

*Stuart A. Smith* argued the cause for the United States. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Ferguson,* and *Michael L. Paup.*

*LeRoy Katz* argued the cause for respondents and filed a brief for respondent Black Hawk Coal Corp., Inc. *Lloyd R. Persun* and *Howell C. Mette* filed a brief for respondents Swank et al. *Woodrow A. Potesta* and *Robert Lathrop* filed a brief for respondent Bull Run Mining Co., Inc.

Justice Stevens delivered the opinion of the Court.

The owner of an economic interest in a mineral deposit is allowed a special deduction from taxable income measured by a percentage of his gross income derived from exhaustion of the mineral. This deduction, codified in §§ 611 and 613 of the Internal Revenue Code of 1954, is designed to compensate such owners for the exhaustion of their interest in a wasting asset, the mineral in place.[1] This case presents the question

---

[1] "§ 611. Allowance of deduction for depletion

"(a) *General Rule*

"In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary. . . ." 26 U. S. C. § 611 (a).

"§ 613. Percentage depletion

"(a) *General Rule*

"In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the

whether that "percentage depletion" allowance must be denied to otherwise eligible lessees of underground coal because their leases were subject to termination by the lessor on 30 days' notice.

This question arises out of three different tax refund suits that were decided by the Court of Claims in a single opinion. 221 Ct. Cl. 246, 602 F. 2d 348. The controlling facts are essentially the same in all three cases. Each taxpayer operated a coal mine pursuant to a written lease; in exchange for a fixed royalty per ton, the lessor granted the lessee the right to extract coal and to sell it at prices determined by the lessee. Each lease contained a clause permitting the lessor to terminate the lease on 30 days' notice. In fact, however, none of the lessors exercised that right; each lessee mined a substantial tonnage of coal during an uninterrupted operation that continued for several years. The proceeds from the sale of the coal represented the only revenue from which the lessees recovered the royalties paid to the lessors.

In each of the cases, certain additional facts help to illuminate the issue. In the *Black Hawk* [2] case the lease was to continue "during the term commencing on the first · day

---

percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). . . . In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section.

"(b) *Percentage depletion rates*

"The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

. . . .

"(4) *10 percent*

"Asbestos, . . . brucite, coal, lignite, perlite, sodium chloride, and wollastonite." 26 U. S. C. §§ 613 (a), (b) (4).

[2] Black Hawk Coal Corp., Inc., operated drift mines in Pike County, Ky. Its refund suit covered the tax years 1970–1972.

of March, 1964, and terminating when LESSEE shall have exhausted all of The Feds Creek (or Clintwood) Seam of coal, . . . or until said tenancy shall be earlier terminated . . . ." App. 77a. The lease required Black Hawk to pay a royalty of 25 cents per ton of coal or $5,000 per year, whichever was larger. *Id.*, at 77a–78a. In addition, the lease required Black Hawk to pay all taxes on the underground coal, as well as the taxes on its plant and equipment and on mined coal. *Id.*, at 79a. Black Hawk paid independent contractors a fixed price per ton to remove the coal, and Black Hawk was free to sell the coal to any party at whatever price it could obtain. Black Hawk mined the seam to exhaustion, operating continuously under the lease for 13 years. *Id.*, at 70a–71a. The Government stipulated that Black Hawk was the sole claimant to the percentage depletion deduction; no claim had been made by the lessor or by any independent mining contractor employed by Black Hawk. *Id.*, at 71a.

The *Swank* case involves two separate leases executed by Swank and Northumberland County, Pa., pursuant to which Swank operated mines on land owned by the county. The first lease, a deep-mining lease executed in 1964, was terminated in 1968 after a mountain slide forced Swank to close the mine. *Id.*, at 52a. The second, a strip-mining lease executed in 1966, was still being operated by Swank's successor in interest in 1977 when the case was tried. During the tax years in dispute, Swank's royalty payments to the county at the rate of 35 cents per ton amounted to $7,545.10 in 1966 and $6,854.05 in 1967. *Id.*, at 53a. The deduction for depletion, which was based on the gross income received from the sale of the coal, was significantly larger.[3] The record also indicates that Swank invested significant sums in the construc-

---

[3] The Government states that the depletion deductions claimed by Swank in 1966 and 1967 amounted to $41,371.24 and $15,204.32. Brief for United States 3. See also App. 8a–9a. No other party claimed the depletion deduction on coal mined by Swank.

tion of access roads, the acquisition of equipment, and the purchase and improvement of a "tipple"—the surface structure that is used to remove slate and rock from the mined product and to sort the coal into specific sizes for marketing. *Id.*, at 55a–56a.

The *Bull Run*[4] case involves a 5-year lease executed in 1967 and renewed in 1972. *Id.*, at 90a–91a. Unlike the leases in the other cases, it gave the lessor a right of first purchase if it was willing to meet the lessee's price, and in the tax year in dispute the lessor did purchase all of the coal mined by Bull Run. 221 Ct. Cl., at 249, n. 4, 602 F. 2d, at 350, n. 4. The lease did not, however, limit the lessee's right to set selling prices or to sell to others who were willing to pay more than the lessor. *Ibid.* Like the lease in *Black Hawk,* the lease provided for a royalty of 25 cents per ton. App. 91a. As is also true in both *Black Hawk* and *Swank,* there is no suggestion that any other party has made any claim to any part of the percentage depletion allowance at issue in this case.[5] See *id.*, at 92a. The Bull Run lease, like the others, contained a provision giving the lessor the right to cancel on 30 days' written notice.[6]

---

[4] Bull Run Mining Co. operated in West Virginia. In its brief, Bull Run states that the leased coal was mined to exhaustion in September 1978. Brief for Respondent Bull Run Mining Co. 2.

[5] Bull Run claimed a depletion deduction of $39,981.41 for 1974, the tax year in question. App. 92a.

[6] The relevant section of the lease provides:

"5. *CANCELLATION.* It is agreed between the parties that either party to this agreement may cancel this lease upon giving to the other party a written notice at least thirty (30) days prior to the effective date of said cancellation. If any coal is mined during said thirty (30) day period, the same shall be paid for the same as if said notice were not given, and upon the expiration of said thirty (30) days, Lessee agrees to deliver the possession of said premises to the Lessor. Upon such cancellation becoming effective, Lessor shall reasonably compensate Lessee for the then fair market value of track, conveyors, dumps, bins, motors and other equipment which Lessee shall have affixed to the premises, and if the parties

## I

Since 1913 the Internal Revenue Code or its predecessors have provided special deductions for depletion of wasting assets. We have explained these deductions as resting "on the theory that the extraction of minerals gradually exhausts the capital investment in the mineral deposit," and therefore the depletion allowance permits "a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted, the owner's capital is unimpaired." *Commissioner* v. *Southwest Exploration Co.*, 350 U. S. 308, 312.[7] The percentage depletion allowance, however, is clearly more than a method of enabling the operator of a coal mine to recover the amount he has paid for the unmined coal. Because the deduction is computed as a percentage of his gross income from the mining operation and is not computed with reference to the operator's investment, it provides a special incentive for engaging in this line of business that goes well beyond a purpose of merely allowing the owner of a wasting asset to recoup the capital invested in that asset.[8] As the Court said in *Southwest Exploration Co., supra:*

"The present allowance, however, bears little relation-

_____

cannot agree upon such compensation, Lessee shall have a period of four (4) months within which to remove his equipment, from the effective date of cancellation." *Id.*, at 96a.

[7] In *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362, 366, the Court explained that the deduction "is permitted in recognition of the fact that the mineral deposits are wasting assets and is intended as compensation to the owner for the part used up in production."

[8] The *Swank* case is illustrative of the nature of the depletion deduction. We can determine from the fact that Swank paid royalties of $7,545.10 in 1966 and $6,854.05 in 1967 that Swank mined roughly the same amount of coal in both years, 21,557 tons in 1966 and 19,585 tons in 1967. Thus Swank could apparently claim a depletion allowance of about $1.92 per ton in 1966 and about 78 cents per ton in 1967. Inasmuch as the depletion allowance is a percentage of gross income, these figures—which suggest that the selling price of the coal may have been almost as high as $20

ship to the capital investment, and the taxpayer is not limited to a recoupment on his original investment. The allowance continues so long as minerals are extracted, and even though no money was actually invested in the deposit. The depletion allowance in the Internal Revenue Code of 1939 [the forerunner of the present statute] is solely a matter of congressional grace . . . ." 350 U. S., at 312.[9]

Hence eligibility for the deduction is determined not by the amount of the capital investment but by the mine operator's "economic interest" in the coal.[10]

A recognition that the percentage depletion allowance is more than merely a recovery of the cost of the unmined coal is especially significant in this case. The question here is

---

a ton—indicate the lack of any specific relationship between the lessee's cost of the raw coal and the value of the depletion allowance.

[9] In the Revenue Act of 1918, the capital to be recovered through the depletion allowance was not determined by the owner's investment in the minerals but rather was measured by the fair market value of the property at the date the mineral deposits were "discovered." See Revenue Act of 1918, ch. 18, §§ 214 (a) (10), 234 (a) (9), 40 Stat. 1068, 1078. Although this method of determining the depletion allowance was changed to the percentage depletion method for oil and gas in 1926, Revenue Act of 1926, ch. 27, § 204 (c), 44 Stat. (part 2) 16, and for coal in 1932, Revenue Act of 1932, ch. 209, § 114 (b) (4), 47 Stat. 203, this Court, in *Helvering* v. *Bankline Oil Co., supra,* at 366-367, recognized that "[t]he granting of an arbitrary deduction . . . of a percentage of gross income was in the interest of convenience and in no way altered the fundamental theory of the allowance." Thus since 1918 the depletion deduction has not been limited to a recoupment of the operator's investment.

[10] The Court developed the "economic interest" test in *Palmer* v. *Bender,* 287 U. S. 551. In *Palmer,* the Court stated:

"The language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." *Id.,* at 557.

whether a deduction for the asset depleted by respondents will be received by *anyone*.[11] The tax consequences of the lessors' receipt of royalties will not be affected, either favor-

[11] The Government argues that the Court of Claims erred in concluding that a consequence of the Government's position is that no one will receive the percentage depletion deduction. See 221 Ct. Cl. 246, 251, 602 F. 2d 348, 351; Brief for United States 22–23. This argument is not persuasive.

Under § 631 (c) of the Internal Revenue Code, the lessor is required to treat his royalty income as a capital gain and is not entitled to claim a percentage depletion deduction. Section 631 (c) provides in pertinent part:

"In the case of the disposal of coal (including lignite), or iron ore mined in the United States, held for more than 1 year before such disposal, by the owner thereof under any form of contract by virtue of which such owner retains an economic interest in such coal or iron ore, the difference between the amount realized from the disposal of such coal or iron ore and the adjusted depletion basis thereof plus the deductions disallowed for the taxable year under section 272 shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal or iron ore. *Such owner shall not be entitled to the allowance for percentage depletion provided in section 613 with respect to such coal or iron ore.* This subsection shall not apply to income realized by any owner as a co-adventurer, partner, or principal in the mining of such coal or iron ore, and the word 'owner' means any person who owns an economic interest in coal or iron ore in place, including a sublessor." 26 U. S. C. § 631 (c) (1976 ed., Supp. III) (emphasis added).

Unlike the percentage depletion deduction, the capital gains treatment required by § 631 (c) is directly related to the lessor's capital investment in the mine. Because the lessor's gain is measured by the difference between his cost, computed on a per ton basis, and his royalty, he of course recoups his capital investment as the coal is mined. In this sense, he receives "cost depletion." The difference between the lessor's "cost depletion" and the lessee's "percentage depletion" is indicated by the record in the *Swank* case. In 1966 the royalty payments amounted to $7,545.10; a part of that amount was the lessor's capital gain and the remainder was his "cost depletion." In contrast, the "percentage depletion" claimed by the lessee amounted to $41,371.24. The amounts are not in dispute. Thus, contrary to the Government's argument, the provision of capital gains treatment to the lessor does not indicate that the percentage depletion deduction, which we have characterized as a form of "congressional grace,"

ably or unfavorably, by our decision in this case.[12] The Government therefore is not contending that the wrong party is claiming the percentage depletion allowance. Rather, the Government takes the position that no such deduction shall be allowed to any party if the legal interest of the lessee-operator is subject to cancellation on short notice.[13]

## II

The language of the controlling statute makes no reference to the minimum duration of the interest in mineral deposits on which a taxpayer may base his claim to percentage depletion.[14] The relevant Treasury Regulation merely requires the taxpayer to have an "economic interest" in the unmined coal.[15] That term is broadly defined by regulation as follows:

"(b) *Economic interest.* (1) Annual depletion deduc-

---

will be available to some other party if it cannot be claimed by the lessee. See n. 12, *infra.*

[12] The Government conceded at oral argument that the lessor's entitlement to the capital gain treatment of the royalty proceeds would be the same regardless of whether the lessee is entitled to percentage depletion. Tr. of Oral Arg. 16. Moreover, the Government also conceded that even if the lessees had a long-term lease and were clearly entitled to the depletion allowance, the lessors would nevertheless have a retained economic interest in the coal. *Id.,* at 16–18. Therefore, the lessors would be required by § 631 (c) to take capital gains rather than a depletion deduction regardless of whether we hold that the lessee is entitled to the percentage depletion deduction.

[13] Although these cases involve provisions for cancellation on 30 days' notice, the Government advises us that it takes the same position with respect to any lease cancellable on less than one year's notice. Tr. of Oral Arg. 8. This position has its genesis in G. C. M. 26290, 1950–1 Cum. Bull. 42, declared obsolete, Rev. Rul. 70–277, 1970–1 Cum. Bull. 280. See also Rev. Rul. 74–507, 1974–2 Cum. Bull. 179.

[14] See n. 1, *supra.*

[15] The Court early recognized that lessees had an economic interest in the mines:

"It is, of course, true that the leases here under review did not convey title to the unextracted ore deposits . . . ; but it is equally true that such

tions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital." [16]

The Government's argument that the termination clause deprived the lessees of an economic interest is advanced in two forms. First, the Government notes that the regulation distinguishes a mere "economic advantage" [17] from a depletable "economic interest," and argues that two cases—*Parsons v. Smith*, 359 U. S. 215, and *Paragon Jewel Coal Co. v. Commissioner*, 380 U. S. 624—in which the Court concluded that mining contractors had only an "economic advantage" rather than an "economic interest" in coal deposits—support the conclusion that these lessees also had a mere "economic advantage." Second, the Government argues as a matter of "practical economics" that the right to terminate gives the lessor the only significant economic interest in the coal. Neither submission is persuasive.

The *Parsons* opinion covered two consolidated cases with similar facts. In each the owner of coal-bearing land entered

leases, conferring upon the lessee the exclusive possession of the deposits and the valuable right of removing and reducing the ore to ownership, created a very real and substantial interest therein. . . . And there can be no doubt that such an interest is property." *Lynch v. Alworth-Stephens Co.*, 267 U. S. 364, 369.

[16] Treas. Reg. §1.611–1 (b), 26 CFR § 1.611–1 (b) (1980).

[17] The regulation provides an example of such an "economic advantage":

"[A]n agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest." *Ibid.*

into a contract with the taxpayer providing that the taxpayer would strip-mine the coal and deliver it to the owner for a fixed price per ton. Neither of the contracts purported to give the mining contractor any interest in the coal, either before or after it was mined, or any right to sell it to third parties. See 359 U. S., at 216–219. The contracts were terminable on short notice and terminability was one of the seven factors the Court listed to support its conclusion that the independent contractors did not have an economic interest in the coal.[18] It is perfectly clear, however, that the Court would have reached the same conclusion if that factor had not been present.

The facts in the *Paragon Jewel* case were much like those in *Parsons,* except that the mining contractors dealt with

---

[18] The Court listed the seven factors in this paragraph:

"To recapitulate, the asserted fiction is opposed to the facts (1) that petitioners' investments were in their equipment, all of which was movable—not in the coal in place; (2) that their investments in equipment were recoverable through depreciation—not depletion; (3) *that the contracts were completely terminable without cause on short notice;* (4) that the landowners did not agree to surrender and did not actually surrender to petitioners any capital interest in the coal in place; (5) that the coal at all times, even after it was mined, belonged entirely to the landowners, and that petitioners could not sell or keep any of it but were required to deliver all that they mined to the landowners; (6) that petitioners were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for each ton mined and delivered, which was, as stated in *Huss,* agreed to be in 'full compensation for the full performance of all work and for the furnishing of all [labor] and equipment required for the work'; and (7) that petitioners, thus, agreed to look only to the landowners for all sums to become due them under their contracts. The agreement of the landowners to pay a fixed sum per ton for mining and delivering the coal 'was a personal covenant and did not purport to grant [petitioners] an interest in the [coal in place].' *Helvering* v. *O'Donnell,* 303 U. S. 370, 372. Surely these facts show that petitioners did not actually make any capital investment in, or acquire any economic interest in, the coal in place, and that they may not fictionally be regarded as having done so." 359 U. S., at 225 (emphasis added).

lessees instead of the owners of the underground coal. As in *Parsons,* the contractors agreed to mine the coal at their own expense and deliver it to Paragon's tipple at a fixed fee per ton.[19] The contractors had no control over the coal after delivery to Paragon, had no responsibility for its sale or in fixing its price, and did not even know the price at which Paragon sold the coal. 380 U. S., at 628. The Court stated that the Commissioner took the position that

"only a taxpayer with a legally enforceable right to share in the value of a mineral deposit has a depletable capital or economic interest in that deposit and the contract miners in this case had no such interest in the unmined coal." *Id.,* at 627.

The Court agreed that the miners did not have an economic interest in the coal:

"Here, Paragon was bound to pay the posted fee regardless of the condition of the market at the time of the particular delivery and thus the contract miners did not look to the sale of the coal for a return of their investment, but looked solely to Paragon to abide by its covenant." *Id.,* at 635.

Thus in *Paragon Jewel Coal Co.,* as in *Parsons,* the terminability of the agreements was not the dispositive factor,[20] and

---

[19] Although this fee varied depending on the general trends of the market price and labor costs, the Court noted that such changes "were always prospective, the contractors being notified several days in advance of any change so that they always knew the amount they would get for the mining of the coal upon delivery." 380 U. S., at 628.

[20] With respect to the terminability issue, although no specific right to terminate was mentioned in the agreement, the *Paragon Jewel* Court concluded that because the contractors had apparently been able to terminate at will, such a power should also be imputed to Paragon. The Court indicated, however, that even if the agreements were not terminable at will, the "right to mine to exhaustion, without more, does not constitute an economic interest under *Parsons." Id.,* at 634.

neither case answers the narrow question before us in this case.[21]

The contrast between the interest of the contractors in *Parsons* and *Paragon Jewel* and the lessees in these cases is stark. Whereas those contractors never acquired any legal interest in the coal, the lessees in these cases had a legal interest in the mineral both before and after it was mined, and were free to sell the coal at whatever price the market could bear. Indeed, the Government does not contend that, absent the termination clauses, the lessees would not have had an economic interest in the coal. In contrast, it seems clear that the contract miners' interest in the *Parsons* and *Paragon Jewel* cases would have been insufficient even if their agreements had been for a fixed term.

The Government, however, does argue that the lessors' right to terminate the leases alone made the taxpayers' interest so tenuous as to defeat a claim to the percentage depletion deduction.[22] According to the Government, as a mat-

---

[21] Another distinguishing feature of *Paragon Jewel* is that that case really presented an issue respecting which taxpayer—the contract miner or the lessee—should receive the depletion allowance. See *id.*, at 626, 630; *id.*, at 639–649 (Goldberg, J., dissenting). The fact that the existence of a right to terminate is relevant in what is essentially a dispute between the parties to the contract surely does not support the conclusion that such an unexercised right has any bearing on the question whether *any* taxpayer may claim percentage depletion.

[22] "Although he has a potential right to benefit from a rise in the market, that right is illusory for practical economics will compel the lessor to terminate the lease and conclude a more favorable arrangement if market conditions so dictate." Brief for United States 19.

"As we have pointed out (*supra*, page 19), if the market price of the minerals rises above the lessor's royalty, the lessor will assuredly exercise his right to terminate the lease on short notice and will either enter into a more profitable lease or extract the mineral himself and sell it. In these circumstances, the lease provision permitting termination on short notice gives the lessor the unilateral right to assume complete and unfettered dominion over the mineral deposit, *viz.*, an economic interest in the minerals in place. The unexercised termination clause therefore

ter of "practical economics" an increase in the price of the minerals will "assuredly" lead to an exercise of the lessors' right to terminate; accordingly, the only significant economic interest is controlled by the lessor. We find this theoretical argument unpersuasive for at least three reasons.

First, the royalty rate is a relatively small element of the mine operator's total cost.[23] Therefore, even if the price of coal increases, the lessor cannot be certain that he will be able to negotiate a more favorable lease with another lessee. Moreover, the quantity of coal extracted by the operator each year may be as important in providing royalties for the lessor as the rate per ton. Purely as a theoretical matter, it therefore is by no means certain that an increase in the price of coal will induce a lessor to terminate a satisfactory business relationship. Indeed, the only evidence in the record—the history of three different operations that were uninterrupted for many years—tends to belie the Government's entire argument.[24]

Second, from the standpoint of the taxpayer who did in fact conduct a prolonged and continuous operation, it would

---

has profound economic significance, rather than, as the decision below erroneously concluded (Pet. App. 5a), 'mere existence.'" *Id.*, at 21–22 (footnotes omitted).

[23] In *Swank*, for example, the royalty payment was 35 cents per ton, while the price of coal apparently approached $20 per ton. See n. 8, *supra*.

[24] The Court of Claims opinion also recognized the weakness of this argument. The court stated that counsel for one of the taxpayers at oral argument had noted that the lessors had not terminated even though the value of coal had increased markedly. The taxpayer argued that lessors would be reluctant to terminate because "the costs of continuing with an existing mine are usually so great, comparatively, that it is difficult for a lessor to obtain new lessees at terms more favorable to the lessors than the existing leases." 221 Ct. Cl., at 251, n. 9, 602 F. 2d, at 351, n. 9. The court did not accept these representations as evidence but indicated that "the record contains nothing to contradict this explanation for what seems to be the fact that leases of this type have not been regularly cancelled by lessors in recent years." *Ibid.*

seem rather unfair to deny him a tax benefit that is available to his competitors simply because he accepted a business risk—the risk of termination—that his competitors were able to avoid when they negotiated their mining leases. It is unlikely that Congress intended to limit the availability of the percentage depletion deduction to the mining operations with the greatest bargaining power.

Third, and most important, the Government has not suggested any rational basis for linking the right to a depletion deduction to the period of time that the taxpayer operates a mine. If the authorization of a special tax benefit for mining a seam of coal to exhaustion is sound policy, that policy would seem equally sound whether the entire operation is conducted by one taxpayer over a prolonged period or by a series of taxpayers operating for successive shorter periods. The Government has suggested no reason why the efficient removal of a great quantity of coal in less than 30 days should have different tax consequences than the slower removal of the same quantity over a prolonged period.[25]

The Court of Claims correctly concluded that the mere existence of the lessors' unexercised right to terminate these leases did not destroy the taxpayers' economic interest in the leased mineral deposits.

The judgment is

*Affirmed.*

JUSTICE WHITE, with whom JUSTICE STEWART joins, dissenting.

The Court today rejects the Internal Revenue Service's interpretation of §§ 611 and 613 and the applicable regulation because it has not "suggested any rational basis for linking

---

[25] As we have indicated, the depletion deduction is geared to the depletion of the mineral in place, and not to the taxpayer's capital investment. Therefore, we can perceive no reason to impose duration requirements on the availability of the deduction for taxpayers who admittedly otherwise have an "economic interest" in the coal, are dependent on the market to recover their costs, and are actually depleting the mineral in place.

the right to a depletion deduction to the period of time that the taxpayer operates a mine." *Ante*, at 585. The Court suggests that depletion tax policy should be the same "whether the entire operation is conducted by one taxpayer over a prolonged period or by a series of taxpayers operating for successive shorter periods." *Ibid.* My disagreement with the Court's opinion is simple. It is not our function to speculate on who deserves an allowance; our duty is to determine if the Service's interpretation is a reasonable one. Since in my view the construction of the statutory provisions and the attendant regulation is clearly acceptable, I dissent.

Congress has provided for a depletion allowance in recognition of the fact that mineral deposits are wasting assets, in order to compensate "the owner for the part used up in production." *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362, 366 (1938). The theoretical justification for the allowance is that it will permit an owner to recoup his capital investment in the minerals as the resources are being exhausted. *Commissioner* v. *Southwest Exploration Co.*, 350 U. S. 308, 312 (1956); *United States* v. *Cannelton Sewer Pipe Co.*, 364 U. S. 76, 81 (1960). The fact that the manner of calculating the depletion allowance has changed and is not that closely tied to the underlying justification of recouping a party's capital investment is immaterial since the method of calculating the deduction is a matter of convenience and "in no way alter[s] the fundamental theory of the allowance." *Bankline Oil, supra,* at 367. In essence, therefore, any "right" to a depletion allowance under the statute is properly predicated on some indication of capital investment in the minerals in place.

From the earliest cases dealing with the statutory predecessors of § 611 and § 613, this Court has recognized the "capital investment" theory underlying the depletion allowance. In *Palmer* v. *Bender*, 287 U. S. 551, 557 (1933), the Court stated:

"The language of the statute is broad enough to provide,

at least, for every case in which the taxpayer has acquired, *by investment,* any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a *return of his capital."* (Emphasis supplied.)

Other cases have expressed the capital investment theory in somewhat different terms by noting that there exists a critical distinction between possessing an economic *interest* in the minerals in place, which entitles a party to the depletion allowance, and possessing a mere economic *advantage,* which does not entitle one to the allowance. See *Bankline Oil, supra,* at 367 (" 'economic interest' is not to be taken as embracing a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit"); *Kirby Petroleum Co.* v. *Commissioner,* 326 U. S. 599, 603 (1946).

It is true, as recognized by the Court, that the statute does not specifically refer to a minimum duration of a leasehold to qualify a lessee to an allowance. But it is also true that the Service has promulgated a regulation which has fully adopted the "economic advantage-interest" distinction noted in the Court's earlier opinions:

"(b) *Economic interest.* (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. . . . *A person who has no capital investment in the mineral deposit . . . does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production.* For ex-

ample, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest. . . ." Treas. Reg. § 1.611–1 (b), 26 CFR § 1.611–1 (b) (1980) (emphasis supplied).

Under the Court's prior cases, the regulation's explicit acceptance of the economic-interest standard is proper and must be afforded substantial weight by a reviewing court. A regulation adopted pursuant to a statute must be given effect if there is a reasonable basis for the interpretation given by the Commissioner. See *Fulman* v. *United States,* 434 U. S. 528, 533 (1978); *Bingler* v. *Johnson,* 394 U. S. 741, 749–750 (1969); *Commissioner* v. *South Texas Lumber Co.,* 333 U. S. 496, 501 (1948). Here, imposing an economic-interest requirement for any entitlement to a depletion allowance is clearly reasonable given that our prior cases have indicated that the statute encompassed such a requirement. Indeed, earlier versions of the same regulation have been expressly accepted and applied by the Court. See, *e. g., Paragon Jewel Coal Co.* v. *Commissioner,* 380 U. S. 624, 632 (1965).

Furthermore, although the term "economic interest" is not self-defining, the Service has the authority and the responsibility to interpret and apply the economic-interest standard contained in its own regulation. It has done so through various interpretative decisions and has concluded in the exercise of its expertise that the duration of the leasehold interest is a critical factor in determining a lessee's right to a depletion allowance under the statute.[1] A coal mining company's in-

---

[1] The position of the Service is that in order for a leaseholder to qualify as possessing an economic interest in the mineral deposit, the leaseholder's "right to extract must be of sufficient duration to allow it to remove a substantial amount of the mineral deposit to which it would look for a

terest in the coal lands may run from a straightforward fee simple ownership to a variety of lesser interests down to a nonexclusive right to extract coal as a tenant at will. The Service is of the view that a taxpayer operating pursuant to a lease must be assured of a right to continue mining for a reasonably long period of time. Accordingly, the Service believes that a lease which is revocable on short notice does not create a sufficient economic interest to justify the taking of a depletion allowance.

The Service's interpretation of its own regulation is entitled to deference. See *Ford Motor Credit Co.* v. *Milhollin*, 444 U. S. 555, 566 (1980) ("[a]n agency's construction of its own regulations has been regarded as especially due [considerable respect]"); *Bowles* v. *Seminole Rock & Sand Co.*, 325 U. S. 410, 413–414 (1945) (courts must look to "administrative construction of the regulation if the meaning of the words used is in doubt" and give it "controlling weight unless it is plainly erroneous or inconsistent with the regulation"). See also *Fribourg Navigation Co.* v. *Commissioner*, 383 U. S. 272, 300 (1966) (WHITE, J., dissenting) (given that Congress gave to "the Secretary of the Treasury or his delegate, not to this Court, the primary responsibility of determining what constitutes a 'reasonable' allowance for depreciation," courts should affirm the Commissioner's position

___

return of its capital." Rev. Rul. 74–506, 1974–2 Cum. Bull. 178–179 (6-month lease where it was anticipated that the period was sufficient to exhaust a mineral deposit did provide a sufficient economic interest). See Rev. Rul. 77–341, 1977–2 Cum. Bull. 204–205. The Service has also indicated that a 1-year lease which was renewable unless terminated for cause was sufficient for a coal mining lessee to acquire an economic interest for the purposes of obtaining a depletion allowance under § 613 of the Code. See Rev. Rul. 74–507, 1974–2 Cum. Bull. 179. See also G. C. M. 26290, 1950–1 Cum. Bull. 42. Thus, contrary to the Court's view, the Service has not focused on the duration of the lease as the only relevant factor. Marketing schemes and other indicia of economic ownership are also relevant in the determination.

when he "adopts a rational position that is consistent with the purpose behind the depreciation deduction, congressional intent, and the language of the statute and interpretative Treasury Regulations"). Of course, Revenue Rulings and other interpretative documents do not have the same force as Treasury Regulations. But this fact does not mean that the consistent interpretation of the Service may be disregarded because the Court feels another interpretation is more reasonable, especially in cases like the present where the interpretation involves the application of terms expressly used in the regulation. Indeed, in *National Muffler Dealers Assn. v. United States,* 440 U. S. 472 (1979), the Court afforded substantial deference to the Service's interpretation of a phrase in a regulation. Under the relevant regulation, certain tax advantages were made dependent on whether a particular activity was in a "line of business." Like the "economic interest" concept involved in this case, the meaning of "line of business" was open to different interpretations. The Commissioner, as expressed in a variety of Revenue Rulings, see *id.,* at 483–484, had defined "line of business" in a narrow fashion. The Court upheld the administrative interpretation of the "line of business" concept, and stated:

"In short, while the Commissioner's reading of § 501 (c)(6) perhaps is not the only possible one, it does bear a fair relationship to the language of the statute, it reflects the views of those who sought its enactment, and it matches the purpose they articulated. It evolved as the Commissioner administered the statute and attempted to give to a new phrase a content that would reflect congressional design. The regulation has stood for 50 years, and the Commissioner infrequently but consistently has interpreted it to exclude an organization like the Association that is not industrywide. *The Commissioner's view therefore merits serious deference." Id.,* at 484 (emphasis supplied).

In my view, the posture of the present case is identical to that of *National Muffler*. Here, the acknowledged standard of an economic interest contained in the regulation has been interpreted by the Service to require a lessee to possess a lease which is not terminable at will on short notice. This consistent interpretation of the applicable regulation is entitled to deference, which the Court today chooses not to give it. It is also significant to note that this interpretation has also been accepted and applied by the majority of the lower courts that have considered the question.[2]

---

[2] See, *e. g., Whitmer* v. *Commissioner*, 443 F. 2d 170, 173 (CA3 1971) (right of lessor to terminate at will "would appear to be fatal to a lessee's ability to claim the depletion deduction, because no right to extract until exhaustion of the coal has been granted"); *McCall* v. *Commissioner*, 312 F. 2d 699, 705 (CA4 1963) ("[w]here the contract is terminable at will, at least by the owner or long-term lessee, that feature is the determining feature"); *United States* v. *Stallard*, 273 F. 2d 847, 851 (CA4 1959) (the most important factor "is whether the producer has the right under the contract to exhaust the deposit to completion or is subject in this respect to the will of the owner through a provision in the agreement empowering the owner to terminate the contract at will"); *Weaver* v. *Commissioner*, 72 T. C. 594, 606 (1979) ("a miner who can be ousted immediately or on nominal notice from a mineral deposit at any time without cause is not really an owner of any economic interest in the deposit"); *Mullins* v. *Commissioner*, 48 T. C. 571, 583 (1967) (courts have repeatedly held that "the right to mine to exhaustion or for a specific period is the critical factor in determining whether a lessee has obtained a depletable economic interest in the mineral in place"); *Bolling* v. *Commissioner*, 37 T. C. 754 (1962). See also *Costantino* v. *Commissioner*, 445 F. 2d 405, 409 (CA3 1971); *Commissioner* v. *Mammoth Coal Co.*, 229 F. 2d 535 (CA3 1956); *Usibelli* v *Commissioner*, 229 F. 2d 539 (CA9 1955); *Holbrook* v. *Commissioner*, 65 T. C. 415, 418–421 (1975).

To be sure there is authority to the contrary. See *Winters Coal Co.* v. *Commissioner*, 496 F. 2d 995 (CA5 1974); *Bakertown Coal Co.* v. *United States*, 202 Ct. Cl. 842, 485 F. 2d 633 (1973). The decision in *Winters Coal* is obscure because two members of the Fifth Circuit panel held that an economic interest existed for the reason that the taxpayer had purchased surface access rights which were necessary to mine the coal, and given this investment, a depletion allowance was justified. See *Commissioner* v. *South-*

The Service's concern with the nature of the underlying lease in determining whether an economic interest exists is also reasonable in light of our prior cases. In this regard, *Parsons* v. *Smith,* 359 U. S. 215 (1959), and *Paragon Jewel Coal Co.* v. *Commissioner,* 380 U. S. 624 (1965), provide two examples suggesting that the duration of a leasehold interest is an important factor in determining whether an economic interest exists. In *Parsons,* the Court noted that the interest asserted by the mining contractors rested entirely on the contracts. The Court found that the mining contracts did not entitle them to a depletion allowance since the contracts "were completely terminable without cause on short notice." 359 U. S., at 224. In *Paragon Jewel,* a lessee made agreements with various companies to mine the coal. The agreements were silent regarding termination and were apparently for an indefinite period. The contractors were under no obligation to mine any specific amount of coal and were not given the right to mine any area to exhaustion. The Court held that the mining companies had no right to receive a depletion allowance.

None of the reasons forwarded by the Court for rejecting the Service's view is persuasive. The fact that respondents did in fact mine to exhaustion is irrelevant to a determination of the legal rights underlying the leasehold. Indeed, the right to mine to exhaustion, without anything more, "does not constitute an economic interest under *Parsons,* but is 'a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit.'" *Paragon Jewel, supra,* at 634–635 (quoting *Bankline Oil,* 303 U. S., at 367). Both *Paragon Jewel* and *Parsons* also make clear that the fact of coal mining itself, regardless how great the cost of

*west Exploration Co.,* 350 U. S. 308 (1956). The Service indicated that it would not follow *Bakertown Coal* because, in its view, the terminability of a lease was "fatal to a claim of an economic interest . . . ." Rev. Rul. 77–481, 1977–2 Cum. Bull. 205–206.

the equipment or structures required to mine the coal, is irrelevant to the determination whether a mining company is entitled to a depletion allowance. The costs of mining, like the costs of doing any business, are deductible as business expenses or are depreciable expenses under other parts of the Code, and do not themselves serve to create an economic interest in the minerals in place. *Paragon Jewel, supra,* at 630–631; *Parsons, supra,* at 224–225.[3]

In essence, the Court argues that because respondents own the coal and sell it on the open market, they must have an interest in the mineral in place. Accordingly, so the argument goes, they are entitled to a depletion allowance be-

---

[3] Nor is it of any consequence that the owners of the land may not be able to take advantage of the percentage allowance provided by § 611 and § 613 even if the lessees are held not to be entitled to it. Under the Code, the owners are entitled to another favorable tax treatment permitting them to consider royalty payments as capital gains. See 26 U. S. C. § 631 (c) (1976 ed., Supp. III). The tax treatment under § 631 (c) serves the same function as the depletion allowance at issue in this case since the amount which the owner considers as capital gain takes into account his adjusted depletion basis in the coal extracted during the year. Thus, the owner is taxed under the favorable capital gain method only on the difference between the amount realized less the adjusted depletion basis, which is the pro rata cost to the taxpayer of the coal extracted. It is clear, therefore, that § 631 (c) permits the owner to recoup his capital investment without impairment under a method substantially akin to cost depletion. It is specious, therefore, to argue that respondents are entitled to a depletion allowance because the owners are denied one since the owners in fact receive a benefit similar to a depletion allowance.

In any event, even if the owners were denied a depletion allowance, this fact would be immaterial. Tax benefits are not entitlements, and it has been specifically noted that the provision of a depletion allowance is solely a matter of legislative grace. *Paragon Jewel,* 380 U. S., at 631; *Parsons,* 359 U. S., at 219; *Bankline Oil,* 303 U. S., at 366; *Anderson* v. *Helvering,* 310 U. S. 404, 408 (1940); *Commissioner* v. *Southwest Exploration Co., supra,* at 312. The only relevant question is whether under the present law respondents qualify under the statute in their own right, and not with respect to the independent tax treatment of the lessors.

cause they were "at risk" with respect to the market. To be sure, neither *Parsons* nor *Paragon Jewel* involved a situation where the mining concern sold in the open market. But obviously, if the relationship to the market was the sole factor of importance, then the opinions in those two cases could have been drastically simplified. The Court could have stated that the marketing system, in and of itself, was such as to preclude the taking of the depletion allowance. This the Court did not do, and I find it peculiar that the Court today chooses to rewrite those cases in light of what it determines to be the more important factor. Indeed, the Court's focus on the marketing scheme for determining whether a depletion allowance should be permitted is far less sensible than the Service's duration-of-the-lease requirement. Market conditions may change, and drastic changes could predictably result in the leases being cancelled. A company with an assured right to mine the coal for a term is not at the mercy of the lessor. Respondents had no such right and their reliance on the market for economic return on their investment is therefore illusory since it is dependent on the lessor's willingness to permit continued extraction of the coal. The fact that in these particular cases this did not happen is beside the point. What matters is that respondents had absolutely no legal right to mine coal beyond the 30-day period provided in the leases. In this light, the Service was well within bounds in concluding that they had not demonstrated an economic interest in the mineral in place.

Of course, the question of what constitutes an economic interest is susceptible to differing interpretations. A 1-day lease would clearly not give the mining company any reasonable expectation of economic interest in the minerals in place. Perhaps equally clear is the fact that such an economic interest would be created by a long-term lease where the lessee has a guaranteed right to mine an area to exhaustion. In the grey area in between, reasonable minds could differ on the nature of the interests possessed. In my mind, the Service

has reasonably interpreted the acknowledged and accepted distinction between economic interest and economic advantage by focusing on the duration of the leasehold interest. In applying the economic-interest requirement, the Service has reasonably insisted upon some enforceable expectation of continuity in mining rights. It may well be that the Service could have concluded otherwise in the present cases. The point, however, is that the Service believes that a lease which is terminable on 30 days' notice without cause is not long enough to create an economic interest. Because I believe that the Service's long-held view, accepted by most lower courts, can hardly be considered to be irrational, I dissent from the Court's opinion which is nothing more than a substitution of what it deems meet and proper for the wholly reasonable views of the Internal Revenue Service as to the meaning of its own regulation and of the statutory provisions. It is also plain enough to see that with the owner recovering his investment tax-free, allowing depletion to these respondents with no more than an ephemeral interest in the coal is precisely the kind of an unjustified deduction, an undeserved windfall, that we should not require contrary to the informed views of the Service.