**L.W. HARDY CO., INC.**

v.

**The UNITED STATES.**

No. 412–77.

United States Claims Court.

Oct. 7, 1982.

Allen L. Feinstein, Phoenix, Ariz., for plaintiff; Daughton, Feinstein & Wilson, Phoenix, Ariz., of counsel.

James L. Malone III, Washington, D.C., for defendant; Asst. Atty. Gen. M. Carr Ferguson, Theodore D. Peyser, Jr., and Robert S. Watkins, Washington, D.C., of counsel.

## OPINION

SCHWARTZ, Judge:

Plaintiff, L.W. Hardy Co., Inc., an Arizona corporation, sues for a refund of income taxes paid for 1971 through 1974. A stipulation of the parties has dealt with various issues of basis of equipment sold, depreciation of equipment and other miscellaneous deductions, alleged improper diversion and understatement of corporate income, and fraud penalties. The only issue not so resolved is plaintiff's entitlement to a depletion deduction, which would warrant refunds for 1972, 1973 and 1974, in the respective amounts of $17,436, $57,616, and $312,540, for the turquoise extracted by plaintiff from two copper mines in Arizona in those years.

The Government contends that plaintiff's contractual arrangements with the owners of the two copper mines do not constitute an economic interest in the minerals in place, without which no depletion deduction is available (*see* I.R.C. § 614(a); Treas.Reg. § 1.611–1(b); *United States v. Swank*, 451 U.S. 571, 101 S.Ct. 1931, 68 L.Ed.2d 454 (1981)). The question need not be decided in view of the threshold decision that plaintiff's books and records are insufficient to permit calculation of a depletion deduction by the method prescribed by the

Code and regulations. Accompanying findings detail the inadequacies of plaintiff's records. Findings sufficient for the conclusion here reached will be stated.

Since 1961, Mr. L.W. Hardy and, since its incorporation in 1968, the corporate taxpayer have mined turquoise at an open pit copper mine located outside Kingman, in Mohave County, Arizona. The mine is owned by the Duval Corporation and is known as the Kingman mine. In 1973 and 1974, the taxpayer also mined turquoise at a copper mine at Miami, in Gila County, Arizona, owned by Cities Service Corporation; the mine is known as the Miami mine. Plaintiff operates at both mines under licenses from the respective owners.

Turquoise is found in natural or chalk state. The natural is hard and sold in its state as mined. The chalk is softer; hence its name, chalk turquoise. It must be cured, *i.e.*, dried and then steeped in chemicals to be made hard. It commands a lower price than the natural turquoise. Taxpayer mined both kinds, cured the soft, and sold both types. Taxpayer also bought turquoise from "outside" sellers and resold it. Taxpayer also bought and sold small amounts of turquoise jewelry.

Turquoise is found in association with copper. The general method for taxpayer's turquoise mining, *vis-á-vis* the owner of the mine, was for taxpayer to mine and remove turquoise at its cost, so long as its operations did not interfere with the exploration and mining operations of the owner, and pay the owner a royalty rate per pound of turquoise removed.

The Internal Revenue Code of 1954, Section 611(a), allows the deduction of "a reasonable allowance for depletion" of natural deposits, in order to permit the owner of an economic interest in the deposits to effect a tax-free recovery of the depleting asset. *See A. Duda & Sons v. United States*, 560 F.2d 669, 673 (5th Cir.1977). Section 613 authorizes as a depletion deduction a percentage, which varies by the kind of deposit involved, of the "gross income from the property," excluding rents or royalties paid by the taxpayer. The allowance may not exceed 50 percent of the taxpayer's taxable income from the property.

When more than one property is involved, the depletion deduction must be calculated separately for each property. I.R.C. § 614(a); Treas.Reg. § 1.614–1(a)(1); *cf. Bryan v. United States*, 162 Ct.Cl. 440, 319 F.2d 880 (1963) (applying 1939 Code). Income and expense records for each property must be maintained so that separate calculations can be made. I.R.C. § 6001; Treas. Reg. § 1.6001–1(a).[1]

"Gross income from the property" is defined as gross income from mining, section 613(c)(1), since the purpose of the deduction is to compensate for the minerals being depleted. Accordingly, where the extracted minerals are sold without the application of significant manufacturing processes, the gross income received is entirely attributable to the minerals themselves. *See* Treas.Reg. § 1.613–4(a). In such cases, the gross income actually received is multiplied by the depletion percentage for the mineral in question to arrive at the amount of the deduction. The Code and regulations prescribe what processes applied to the minerals are considered to be part of the mining process, so that receipts from the sale, after application of these processes, may still be considered entirely gross income from mining. I.R.C. § 613(c)(4); Treas.Reg. § 1.613–4(f).

Where, however, the taxpayer applies significant other processes (described and defined by the regulations as "non-mining processes," sections 1.613–4(a), (g)), to the minerals before sale, the gross income received is at least in part attributable to value added by the processes and not solely to the minerals. In such cases, a "constructive" gross income must be calculated, to represent the value of the minerals prior to

---

1. Treas.Reg. § 1.6001–1(a) provides:

"[A]ny person subject to tax under subtitle A of the Code * * * shall keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax * * *."

application of the non-mining processes. One method prescribed by the regulations to calculate such constructive gross income requires the determination of a "representative market or field price" of the raw mineral by a comparison of actual sales of the mineral, by the taxpayer and others, prior to application of the non-mining processes. Treas.Reg. § 1.613–4(c). Using the actual quality and amounts sold by the taxpayer after processing and the representative prices of these minerals prior to processing, constructive gross income from mining is computed.

The regulations provide that where—as is here found to be the case—it is impossible to determine a representative market or field price, gross income from mining should be computed by use of the "proportionate profits method." Treas.Reg. § 1.613–4(d)(1)(i). This method begins with the taxpayer's actual gross income from sale of the processed mineral, and then seeks to identify the amount of such income attributable to a taxpayer's mining operation, i.e., the value of the mineral before processing, so that the deduction is allowed only with respect to the income from mining. Treas.Reg. § 1.613–4(d)(4)(i).

The premise of the proportionate profits method is that each dollar of costs expended to produce and sell the end product earns the same percentage of profit. Therefore, the method multiplies the gross sales by a percentage, produced by the division of mining costs by total mining and nonmining costs, to reduce the gross sales to a lower figure attributable entirely to taxpayer's mining activities. This lower figure is "gross income from mining," to which the depletion percentage is applied. The proportionate profits formula, then, is, all mining costs divided by total costs times gross sales equals gross income from mining:

$$\frac{\text{mining costs}}{\text{total costs}} \times \text{gross sales} = \text{gross income from mining}$$

Thus if mining costs were $2,000 and total costs of mining and processing $3,000, the percentage produced by the division of the former by the latter is 66 percent, and if gross sales were $9,000, the gross income from mining would be $6,000.

Returning to the instant case, it is not disputed that turquoise is subject to depletion under the 14 percent rate for "all other minerals" not expressly listed. I.R.C. § 613(b)(7). Further, plaintiff concedes that the extensive chemical treatment and drying process applied to the chalk turquoise, which adds substantial value to it, is a "non-mining process." Last, no real market existed for the chalk turquoise prior to treatment. Actual sales by taxpayer or others of untreated chalk were too insignificant to construct a representative market or field price. Therefore, the taxpayer here purported to compute depletion deductions for each of the three years in suit by the proportionate profits formula described above, to determine gross income from mining. To gross income from mining, it applied the 14 percent depletion rate allowed for turquoise, I.R.C. § 613(b)(7), to arrive at the depletion deduction.

The depletion deduction now claimed was not taken in the original tax returns filed by taxpayer. An accountant retained in late 1975 undertook to file amended returns which would work to plaintiff's advantage by taking a depletion deduction. The deduction asserted in the amended returns was disallowed by the Service, and this suit followed.

The fragmentary records available and used by taxpayer to make its claim consisted of tax returns for the pertinent years, the cash disbursements journal, a partial record of turquoise purchased, certain salary records, and royalty production records from Duval and Cities Service. Missing were accurate sales invoices, i.e., records dividing sales and receipts as between purchased and mined turquoise, and separate records for each mine.

As noted above, the Code and regulations require taxpayer to maintain separate rec-

ords for each property from which a depletion allowance is sought. No such records were maintained, in 1973 and 1974, to distinguish the Miami mine from the Kingman mine; instead, turquoise from the two mines was mixed together at the Kingman processing plant. The taxpayer therefore computed its claimed depletion allowances on both mines together, then attempted to allocate the elements in the depletion formula between the two mines. Allocation of turquoise sales from each mine was based on the relative production of each. Such an allocation might have produced a sufficient estimate if the properties and turquoise extracted were reasonably the same, but the evidence is that conditions at the Miami mine were very different than those at the Kingman mine. It was more difficult to remove turquoise at the Miami mine than at Kingman. Too, the color and hardness of the turquoise varied substantially from the one mine to the other, with inevitably significant bearing on the rate of recovery, processing cost, and sales price and profit. Taxpayer's allocations of sales between the two mines for 1973 and 1974 based simply on gross production figures are therefore unacceptable.

The insufficiency of the records from which to calculate the deductions may be best seen by focusing on the separate elements of the formula for a proper calculation. The formula begins with the taxpayer's total dollar sales of turquoise. The gross sales of turquoise not mined by taxpayer, but rather bought from third persons, cannot be considered "gross income from mining," and so are not subject to the depletion deduction. I.R.C. § 613(c)(1); *see* Treas.Reg. § 1.613–4(f)(1). Sales of purchased turquoise and purchased turquoise jewelry must therefore be subtracted from the total sales figure. Next, the sales of natural turquoise are subtracted; since sales of natural turquoise involve no "nonmining processes," these sales need not be reduced by the proportionate profits method as must sales of the treated chalk turquoise. The resulting figure, gross sales from mined, treated turquoise, must then be reduced to an amount of sales attributa-

ble to the mineral's value as mined prior to the application of nonmining processes.

The next step of the method divides mining costs attributable to treated turquoise by total costs of mining and nonmining. The resulting percentage is multiplied by the gross sales figure, and yields a figure for adjusted sales of treated turquoise. To this is added the natural turquoise sales, which as noted above need not be reduced by the proportionate profits percentage, and there is then subtracted the amount of royalties paid. The product is "gross income from mining," to which the 14 percent depletion rate is applied.

The steps in the calculation will be outlined and then the parenthetically numbered steps will be discussed:

A. Gross Sales of Treated Turquoise

| | |
|---|---|
| Gross dollar sales of all turquoise, agreed by the parties, | 000 |
| Less dollar sales of outside purchases of turquoise (1), | −000 |
| Less jewelry sales agreed be *de minimus,* | −000 |
| Less sales of mined natural turquoise (2) | −000 |
| Equals *gross sales of mined. treated turquoise:* | 000 |

B. Costs and the Proportionate Profits Depletion Percentage

| | |
|---|---|
| Costs of mining treated turquoise (*i.e.,* all costs of mining less cost of mining natural turquoise) (3) | |
| Divided by total costs (mining and nonmining) | 000 |
| Equals the *proportionate profits depletion percentage,* 00% | |

C. Adjusted Gross Sales of mined treated turquoise

| | |
|---|---|
| The foregoing *proportionate profits depletion percentage* applied to the foregoing *gross sales from mined treated turquoise* | × .00% |
| Equals *adjusted gross sales of mined, treated turquoise.* | 000 |

D. Gross Income From Mining

| | |
|---|---|
| The *adjusted gross sales of mined treated turquoise* added to *sales of mined natural turquoise* | |
| Equals *total gross income from mined turquoise* | 000 |
| Less royalties paid | −000 |
| Equals *gross income from mining* | 000 |

E. Percentage Depletion Allowance · × .14

The foregoing *gross income from mining* times the percentage depletion rate of 14% equals the depletion allowance (not to exceed 50% of taxable income from each property)  000

Now, the three weak spots in the calculation:

(1) Taxpayer's records reflect total amounts paid for outside purchases of turquoise, but data showing the prices per pound paid and the poundage involved were not available. Taxpayer's estimates, described below, were disputed by the Government and are not accepted here, for lack of supporting documents and lack of credibility of the supporting testimony. The taxpayer's principal, the only witness with presumed knowledge of the business, was in 1977 convicted of an income tax violation; on trial he admitted financial relations with representatives of the mine owners suggesting at least an induced conflict of interest, and on the stand did not inspire confidence. The only other witness, the accountant involved, had little or no knowledge of the business; he made estimates in the absence of information from records.

In 1972, taxpayer operated only at the Kingman mine but also purchased turquoise from third parties. Taxpayer did not maintain any sales records for 1972 which would indicate what portion of its sales was attributable to Kingman material, for which a depletion deduction would be allowable, and what portion was attributable to the purchased turquoise, for which no depletion deduction was allowable. In 1973 and 1974, taxpayer mined turquoise at both the Kingman and Miami mines. Sales records for those years, again, provide no breakdown between sales of mined turquoise from each mine and sales of purchased turquoise.

Estimates in the record of the price paid for purchased turquoise range from $5 to $15 per pound; estimates of the sale price of this turquoise range from $40 to $80 per pound. Taxpayer chose $15 for estimated purchase and $40 for estimated sale price. Taxpayer's estimates are without supporting evidence. An amount for "dollar sales of outside purchases of turquoise," numbered item 1 above, is thus unavailable.

(2) Sales of mined natural turquoise. No invoices were available for 1972 to distinguish between sales of natural and treated turquoise. Sales records for 1973 and 1974 provide only an incomplete breakdown. In fact, taxpayer's accountant did not rely on such records as exist, but instead estimated the dollar value sales of natural turquoise on the basis of the poundage of natural produced, after an estimated waste factor was applied.

Total poundage of mined natural turquoise produced is agreed upon by the parties (in view of its source, the record of royalties paid to the mine owners). Computation of sales of natural turquoise, however, required a two-fold estimate: of sale price and of wastage. The amount of actual wastage involved in these sales is not shown by the record. Taxpayer estimated it at 10 percent. It is likely that wastage was much greater.

Taxpayer estimated average sales of its mined natural turquoise as $80 per pound for 1972 and 1973. Defendant's estimates are less. Taxpayer estimated 1974 sales of its mined natural turquoise as $90 per pound. Defendant has not objected to this latter estimate. These estimates are all unproven and would be extremely difficult in any event for 1973 and 1974 since the record shows that color and hardness and thus the value of the turquoise varied substantially from Kingman to Miami.

An even more serious fault lies in the fact, noted above, that taxpayer mixed the turquoise from both sites and has no record of sales from the separate properties. The amounts involved are considerable. The net is plain—noncompliance with the requirement of the regulation that each mine be separately treated.

The lack of proof of the estimates and of wastage, and the lack of separate records

for each of the mines' sales of natural and chalk turquoise, result in an unproven figure for "gross sales of mined, treated turquoise," even prior to further major estimates unsupported by records or credible testimony.

(3) Mining costs allocable to treated turquoise show several areas of lack of proof.

The items of taxpayer's costs were obtained from the cash disbursements journal. The regulation directs that costs be divided between mining and nonmining, and that indirect costs, not directly attributable to either, be reasonably allocated between them. Treas.Reg. § 1.613–4(d)(4)(iii). Taxpayer divided its costs into three categories, direct mining, direct nonmining, and "allocable to mining," the last of which was then added in toto to direct mining costs.

The allocation was made on the basis of flat percentages, such as 50 percent to "nonmining" and 50 percent to "mining allocable," or 50 percent to "mining" and 50 percent to "nonmining." Examples are allocation of "advertising" costs as entirely a cost of mining and "legal and accounting" and "director's fees" as 50 percent a direct mining operation. Many if not most of the allocations to mining were made in a patently arbitrary manner, inflating the numerator (mining costs) in the proportionate profits percentage, and thus the amount of the deduction claimed.

Further, the Kingman plant, at which taxpayer processed all its turquoise, was likely not a mining facility but a manufacturing facility. Plant costs should probably be regarded as nonmining, including expenses of transportation to the plant. Yet taxpayer allocated 50 percent of utilities to direct mining costs and split other plant expenses, such as telephone, insurance, and shop supplies, 50–50 between "nonmining" and "allocable to mining." Taxpayer charged to the category "allocable to mining" 75 percent of its costs of gas and oil, repairs, truck maintenance, general maintenance and postage, 25 percent of the costs of travel, and 90 percent of its freight.

The allocations were arbitrary and unrealistic, and are unacceptable. There was no confirmation of the only evidence offered—estimates of various of the costs as strictly 100 percent mining, entirely nonmining, or partially mining and partly manufacturing—and no evidence of better figures. Taxpayer "estimated" the classification of the various costs into the three categories above, on the basis of what its accountant felt was reasonable and not upon any contemporary records. The accountant admitted on the stand that his estimates were guesses, without basis in any familiarity with the business or support in records. Indeed, he testified that he made these guesses because the records were inadequate, and he did not ask Mr. or Mrs. Hardy, the principals of the taxpayer, because he felt that they too did not know the facts.

---

■ It need hardly be said that in tax refund suits such as this, the plaintiff taxpayer has the burden of proof. *See, e.g., Young & Rubicam, Inc. v. United States,* 187 Ct.Cl. 635, 644, 410 F.2d 1233, 1238 (1969) (citing cases). Further, the taxpayer's burden of proof extends not only to legal entitlement to the deduction, but also to the actual amount of the deduction. *Helvering v. Taylor,* 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935); *Missouri Pacific Railroad Co. v. United States,* 168 Ct.Cl. 86, 90, 338 F.2d 668, 671 (1964).

■ Deductions are a matter of legislative grace, and are only allowed upon clear proof of entitlement. *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974). The consequence of lack of evidence on a material element of the deduction is that the taxpayer's claim is to be rejected. *Burnet v. Houston,* 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991 (1931). Taxpayers are obligated to keep sufficient records to establish the amount of tax owing, and thus the amount of deduction claimed. I.R.C. § 6001; Treas.Reg. § 1.6001–1(a). In the absence of such records, entirely unsupported estimates by the taxpayer are

insufficient evidence to allow taxpayer to prevail. *Keiner-Williams Stamping Co. v. United States,* 90 Ct.Cl. 203, 30 F.Supp. 807 (1940).

Records or other probative evidence in this case are so lacking that there is no room for the application of the "best estimate" rule of *Cohan v. Commissioner,* 39 F.2d 540 (2d Cir.1930), *see Southern Railway Co. v. United States,* 218 Ct.Cl. 150, 155–56, 585 F.2d 466, 470 (1978). To accept the taxpayer's arbitrary estimates here on the basis of *Cohan* would be "to condone the use of that doctrine as a substitute for burden of proof. This the court will not do." *Coloman v. Commissioner,* 540 F.2d 427, 431–32 (9th Cir.1976).

On all the evidence, it is concluded that there is wholly insufficient reliable information in the documentary evidence and credible testimony from which to calculate a reasonably accurate depletion allowance under the Code and regulations. The taxpayer's estimates and assumptions are based on guesses without supporting records. Taxpayer has failed to meet its burden of proof, and is therefore not entitled to a depletion deduction.

The stipulation of the parties provides that on the determination of the depletion deduction issue, the taxpayer's liability is to be recomputed on the basis of that determination and the several agreements on the other issues in the complaint and counterclaim. Accordingly, the case is set down, failing agreement of the parties, for further proceedings on the amount of the judgment.

## FINDINGS OF FACT

### Preliminary Matters—Tax Returns and Proceedings

1. (a) Plaintiff, L.W. Hardy Co., Inc. ("taxpayer"), an Arizona corporation incorporated in 1968 filed its federal income tax returns and paid for the taxable years ending December 31, 1971, December 31, 1972, and December 31, 1973, the respective tax of $1,005.42, $18,672.17, and $123,732.79 shown thereon to be due.

(b) For the tax year ending December 31, 1974, taxpayer filed its federal income tax return and its amended return and paid the tax of $1,054,393.95 shown thereon to be due.

2. Taxpayer did not claim any deduction for depletion pursuant to Section 611 of the Internal Revenue Code of 1954 on the returns for 1971, 1972, 1973, and 1974.

3. (a) On March 15, 1976, taxpayer filed a claim for refund of taxes of $14,823.75 paid for 1972. On April 15, 1976, taxpayer filed an amended claim for refund of taxes of $17,436.17 paid for 1972.

(b) On April 15, 1976, taxpayer filed a claim for refund of taxes of $57,615.72 paid for 1973.

(c) On April 15, 1976, taxpayer filed a claim for refund of taxes of $312,539.95 paid for 1974.

4. (a) Taxpayer's claims for refunds for 1972, 1973 and 1974 were based on several contentions, of which only the following issue is involved in the case at bar:

(b) that it was entitled to a deduction for depletion at the rate of 14 percent of its gross income from natural deposits of turquoise mined by it under exclusive mining rights granted it by the owners of the Mineral Park Mine in Mohave County, Arizona, during 1972, 1973, and 1974, and the Pinto Valley Mine in Gila County, Arizona, during 1973 and 1974.

(c) Issues concerning a basis for equipment and the consequent gain or loss, and concerning a capital loss carry-over have been resolved by stipulation.

5. On August 8, 1977, following the expiration of more than six months from the time it filed its claims for refund, taxpayer filed its petition in this court, seeking a judgment against the United States in the amount of its claims for refund, totaling $387,591.91, the total of the three claims for refund, plus interest as allowed by law, and costs.

### Notices of Deficiency, Amended Petition and Counterclaim

6. (a) On January 27, 1978, the Internal Revenue Service issued to taxpayer a No-

tice of Deficiency, based on several grounds including alleged diversion of corporate income, understatement of bank deposits, improper business expense deductions, and fraud penalties. The deficiencies and penalties set forth in the Notice were as follows:

| Year | Deficiency | Penalties |
|------|-----------|-----------|
| 1971 | $29,937.38 | $15,471.40 |
| 1972 | 27,460.94 | 23,066.55 |
| 1973 | 79,405.46 | 39,702.73 |
| 1974 | 2,445.27 | –0– |

(b) On June 28, 1978, defendant filed a counterclaim against taxpayer, seeking the amounts set forth in its Notice of Deficiency for 1972, 1973 and 1974, plus interest. As will appear, the issues raised by the counterclaim need not be decided.

(c) On August 17, 1978, taxpayer paid the amounts set forth in the Notice of Deficiency for 1971, together with accrued interest, in a total sum of $58,021.60, and simultaneously filed a claim for refund of such amounts.

(d) On or about September 8, 1978, the Internal Revenue Service denied taxpayer's claim for refund.

(e) On October 10, 1978, taxpayer filed its first amended petition in this court seeking, in addition to the amounts set forth in its original petition, the amount of its claim for refund of taxes paid for 1971, in the amount of $58,553.59, plus interest as allowed by law. The difference between this figure and the $58,021.60 paid by taxpayer and used in its administrative claim for refund is unexplained.

Stipulation as to Non-Depletion Issues, Counterclaim and Amended Petition

7. (a) The depletion deduction issue concerning taxpayer's taxes in the years 1972, 1973, and 1974 remains to be decided.

(b) The parties have by stipulation accomplished an amendment of the statutory Notice of Deficiency, and resolved the non-depletion issues which are the subject of taxpayer's amended petition filed October 10, 1978, and defendant's counterclaim filed June 28, 1978.

The Taxpayer and its Business

8. For many years prior to 1968, Mr. L.W. Hardy bought and sold turquoise and, beginning in 1961 or 1962, mined turquoise in Arizona.

9. Turquoise is a mineral usually found in veins together with copper deposits.

10. Mr. Hardy is the president and chief operating officer of L.W. Hardy Co., Inc., the taxpayer. He has been president and principal shareholder since its inception.

11. From 1962 through December 31, 1974, Mr. Hardy and taxpayer, since its incorporation, have been engaged in the business of mining turquoise at the "Kingman" mine, described below, pursuant to contract rights first granted by the Duval Corporation in late 1961, and at the "Miami" mine, described below, pursuant to contract rights first granted by the Cities Service Corporation in early 1973.

12. Mr. Hardy and taxpayer have also purchased and sold small amounts of turquoise jewelry.

13. "Mined," and "mining" and "royalties" and similar words are used herein without any implication that taxpayer has an economic interest in minerals in place.

14. Taxpayer had no means to receive any funds from any source other than from the sale of turquoise, in order to recoup its cost of equipment and labor and other costs of mining.

Turquoise Mining at the Kingman Mine

15. Duval Corporation ("Duval") owns Mineral Park, an open-pit copper and molybdenum mining property outside of Kingman, Arizona, known as the Kingman mine.

16. In conducting its mining operations at the Kingman mine, including during the years in issue, taxpayer has

(a) moved earth and rock with bulldozers, loaders, and trucks and hired contractors to do likewise.

(b) maintained a trailer and fuel tanks at the mining site.

(c) mined turquoise, sometimes in areas where Duval was mining for copper and sometimes in areas where only taxpayer was mining.

17. Through 1974, taxpayer and its predecessor, Mr. Hardy, made substantial investments in buildings, vehicles and mining equipment, including caterpillar tractors, loaders, dump trucks, winches, compressors, power plants and haulers, and in processing equipment, including assorted machinery, treating tanks, cleaners and ovens. Through 1972, all of this equipment was used in connection with the Kingman operations, and thereafter some of it was also used in the plant at the Kingman mine engaged in drying and curing the turquoise.

18. Taxpayer's Kingman turquoise mining operations were subject to the mining safety regulations of the State of Arizona, and were inspected by the State Mining Inspector.

The Taxpayer's Agreement with Duval

19. In the years in issue, taxpayer mined turquoise at Kingman under an agreement of December 23, 1961 with Duval.

20. The amounts paid by taxpayer to Duval under the 1961 agreement for turquoise taken from the mine were adjusted on January 1, 1969, following negotiations between the parties.

21. Beginning in 1962, Duval conducted copper and molybdenum mining activities at the mine. These mining activities continued through December 31, 1974, and thereafter, and represented the part of the operation from which Duval derived 97 to 98 percent of its income. For 1972, Duval derived approximately $9.5 million in income from its copper and molybdenum operations and approximately $110,000 (1.2 percent of its Kingman income) in payments from taxpayer for turquoise. For 1973, these figures were $8,885,850 and $241,836 (2.7 percent). For 1974, these figures were $9,987,423 and $506,447 (5.1 percent).

22. The 1961 agreement did not contain the word "lease" or any form of that word and provided in summary that:

(a) Taxpayer could mine and remove from the property, and dispose of the turquoise there, so long as his operations did not interfere with the exploration, development, mining or other work carried on by Duval.

(b) Taxpayer would pay to Duval a royalty per pound of turquoise mined. The royalty rate was based on the grade of turquoise mined.

(c) Taxpayer would mine at locations approved by Duval, and Duval would have the right at all times to inspect taxpayer's work. All mining operations would be on an 8-hour day, 5-day-week basis.

(d) All of taxpayer's work would be at its sole cost and expense. Taxpayer would indemnify and save Duval harmless from all claims and liens, procure all necessary permits and licenses, and comply with all applicable laws and regulations.

(e) Taxpayer would procure and keep in force workmen's compensation and general liability insurance.

(f) Paragraph 5 of the contract provided that:

Duval reserves the right to cancel and terminate this agreement at any time by giving written notice of such cancellation to Hardy not less than twenty-four hours prior to the time said termination is to be effective.

(g) In the event of termination, taxpayer would have five days within which to remove from the property its mining equipment and any stockpiled turquoise.

(h) Taxpayer could not assign the agreement without Duval's written consent.

23. (a) While the agreement provided that Hardy could remove turquoise found anywhere, the non-interference provision in paragraph (a) of the foregoing finding affected taxpayer's operations as follows:

(b) Taxpayer was required to obtain Duval's approval before it could move its operations from one location to another within the mine site.

(c) Taxpayer was prevented from taking turquoise from certain portions of material when, from time to time, this material was required to be transported directly to Duval's copper processing plant before it could be gleaned or culled for turquoise.

(d) Taxpayer could be prohibited from working a particular area for turquoise if Duval had not first worked that area for copper.

(e) Taxpayer was required to move its operations when they interfered with Duval's copper mining schedule or might pose a threat to safety within the mine.

24. Actual interferences with Duval's operations never occured, because Hardy conducted its operations so as not to interfere with Duval's copper mining.

25. (a) There were no restrictions imposed upon Hardy with respect to the sale of turquoise, to whom it could sell, or at what price.

(b) Once taxpayer took the turquoise from the ground at the mine, the turquoise became its property, and it was free to sell it at any price it chose.

(c) In 1973 and 1974, taxpayer sold turquoise to hundreds of different purchasers.

### Financial Dealings Between Taxpayer and Duval

26. (a) Taxpayer paid royalties to Duval based on the pounds and grade of turquoise mined.

(b) With the exception of gifts and a loan to a Duval employee, described below, taxpayer paid no money other than royalties to Duval.

27. There was no agreement between taxpayer and Duval to share profits in the ultimate sale of turquoise.

28. Taxpayer sold to Duval some specimen or trinket pieces of turquoise for which Duval paid taxpayer.

29. Taxpayer did not receive funds from any source to recoup the costs of equipment, labor and other costs of mining, other than from the sale of turquoise.

30. Duval has not claimed a depletion deduction based on the turquoise mined at Kingman, other than on the royalties it received from Hardy.

### The Atlee Negotiations

31. (a) Duval's interpretation of and attitude toward the cancellation clause of paragraph five of the contract, described above, was that it would not cancel the contract without just cause, but that it could cancel the contract if it were financially advantageous to do so, that is, if it got more money from someone else.

(b) During 1974, Duval's general counsel responded to an inquiry from a Mr. Atlee, who desired to take over Hardy's turquoise work, that the contract was cancellable on 24 hours notice. In in-house discussions, Duval decided to consider seriously Mr. Atlee's offer to take over the contract if he would meet certain financial requirements.

(c) When Mr. Hardy heard about this, he wrote to Duval on November 21, 1974, referring to the agreement as a "concession" and stating that "I have heard many rumors about losing the contract with Duval and that the company is discussing the turquoise situation with Atlee. This has made me very dubious about the future."

(d) While the negotiations with Mr. Atlee did not continue, Duval never determined nor was of the view that it was prevented from terminating the contract with Hardy or that the contract with Hardy was not terminable on 24 hours notice.

32. After the Atlee negotiations, taxpayer and Duval negotiated a new agreement, effective January 1, 1975, for the taking of turquoise by taxpayer at the mine. The new agreement contained different provisions from the 1961 agreement, including one for a term of three years. This agreement was amended effective January 1, 1978.

### Credibility of Mr. Hardy as a Witness

33. (a) At various times, including during the tax years in suit, taxpayer's president, L.W. Hardy, made gifts and a loan, at an interest rate below the current market rate, to Duval's Mineral Park mine manager, a Mr. Willie J. Roper.

(b) At about the time these gifts and loan were made, Roper was responsible for recommending adjustments in the payments made by taxpayer to Duval for the extracted turquoise.

(c) These gifts and loan were against Duval company policy and were unknown to Duval until the time of trial.

34. In December 1977, Mr. Hardy was convicted of tax evasion under 26 U.S.C. § 7201 for filing a false income tax return.

Turquoise Mining at the Miami Mine

35. Cities Service Corporation owns both Pinto Valley and Copper Cities, open-pit mining properties near Miami, Arizona.

36. Taxpayer mined turquoise at the Pinto Valley mine (the "Miami mine") from 1973 until 1976. After March 1, 1975, this mining was done under an agreement for a 1-year term.

37. From August 1972 until July 1974, Cities Service was engaged in a preproduction stripping operation at the mine. Beginning in early 1973 taxpayer began to mine turquoise from the site.

38. At the Miami mine, taxpayer

(a) hired contractors to blast and drill rock to uncover turquoise.

(b) moved earth and rock with bulldozers, loaders, and trucks and hired contractors to do likewise.

(c) built roads for access to turquoise mining areas.

(d) maintained facilities, including an office trailer and a change room, at the site.

39. Some of the equipment purchased by taxpayer through 1974, including caterpillar tractors, loaders, dump trucks, forklifts, light plants, fuel storage tanks, and a conveyor system, was used in connection with the Miami mining operations and some was used at the Kingman plant in conjunction with a nonmining process.

40. The turquoise mining operations at Miami were subject to the mining safety regulations of the State of Arizona, and were inspected by the State Mining Inspector.

41. From the time taxpayer started to mine at Miami in 1973 until the turquoise was exhausted in 1976, no one else mined there for turquoise.

42. There were no restrictions imposed upon taxpayer with respect to the sale of turquoise, or to whom it could sell, or at what price.

43. Once taxpayer took the turquoise from the ground, the turquoise became taxpayer's property and taxpayer was free to sell it at any price it chose.

44. In 1973 and 1974, taxpayer sold turquoise from the mine to hundreds of different purchasers.

The Taxpayer's Agreement With
Cities Service

45. On January 8, 1973, taxpayer and Cities Service executed an agreement under which taxpayer could mine and remove turquoise from Cities Service's Miami mine, at any location where Cities Service was not actively operating, subject to the conditions stated in the agreement.

46. Thereafter, in 1973 and 1974, Hardy mined turquoise at the Miami mine under the 1973 agreement.

47. The 1973 agreement with Cities Service did not employ the word "lease," or any form of that word. In effect during the years 1973 and 1974, the years in issue at which taxpayer mined at the Miami mine, it provided that:

(a) Taxpayer would mine turquoise at locations approved by Cities Service and Cities Service would have the right at all times to inspect the work being done by taxpayer;

(b) All mining operations would be on an eight-hour day, five-day week basis;

(c) Taxpayer would supervise and control the manner and method of mining turquoise and Cities Service would have no responsibility for doing so;

(d) Taxpayer would pay to Cities Service a royalty per pound of turquoise mined, at a rate based on the grade of the turquoise mined;

(e) All of taxpayer's work would be at its sole cost and expense. Taxpayer would indemnify and save Cities Service harmless from all claims and liens, procure all necessary permits and licenses, and comply with all applicable laws and regulations;

(f) Taxpayer would procure and keep in force workmen's compensation and general liability insurance;

(g) Paragraph 6 of the agreement provided that:

Owner [Cities Service] reserves the right to cancel and terminate this agreement at any time by giving written notice of such cancellation to Hardy not less than twenty-four (24) hours prior to the time said termination is to be effective.

(h) In the event of termination, taxpayer would have five days within which to remove from the property its mining equipment and any stockpiled turquoise;

(i) Taxpayer could not assign the agreement without Cities Service's written consent;

(j) Taxpayer would cooperate with Cities Service in furthering its policy that its employees should not engage in recovering or removing turquoise during their working hours or at any other time from Cities Service property. Taxpayer agreed not to knowingly purchase any turquoise from Cities Service employees and to report to Cities Service persons offering to him turquoise of the types and character contained on Cities Service property;

(k) Taxpayer could extract and remove from the property turquoise found there, so long as its operations did not interfere with the exploration, development, stripping or other mining work carried on by Cities Service;

Taxpayer's Operations at Miami

48. The noninterference provision of the agreement (preceding finding subparagraph (k)) affected taxpayer's operations in the following manner:

(a) Taxpayer was free to mine wherever Cities Service was not actively operating, but was required to obtain Cities Service's approval before it could move its operations from one location to another within the mine site.

(b) Taxpayer was prevented from taking turquoise from certain portions of material when this material was required to be transported directly to Cities Service's copper processing plant.

(c) In practice, Cities Service would tell taxpayer in which areas of the mine it could conduct its operations. Taxpayer was allowed to operate where Cities Service was not actively operating.

49. Taxpayer conducted its turquoise extraction operations so as not to interfere with Cities Service's mining operations. Where a potential problem was foreseen, taxpayer adjusted its operations to avoid interfering with Cities Service's operations.

50. During the period that both Cities Service and taxpayer were working in the mine, Cities Service would not suspend its activities in a particular area if it located turquoise. Rather, taxpayer would have to wait until Cities Service was finished working in the area where the turquoise was found before it could move its operations to that area. If Cities Service needed material for its copper crusher, taxpayer might not be able to extract turquoise from that material before it was taken to the crusher.

51. Cities Service believed that paragraph 6 of the agreement would allow termination if Cities Service found it impossible to work with Hardy, or if Hardy willfully violated safety regulations, did not coordinate with Cities Service, or interfered with Cities Service's mining operations.

52. During the period from 1973 until taxpayer stopped mining at the Miami mine, Cities Service did not intend to cancel the 1973 Cities Service agreement, and never took any steps to terminate or cancel it.

53. On March 1, 1975, plaintiff and Cities Service entered into a new contract for the extraction of turquoise at the Miami mine. This contract was for a term of one year. In 1976 this agreement was extended for an additional period of three years.

54. Taxpayer continued to mine turquoise at the Miami mine, under the 1973–74 agreement and the successor agreement with different terms, until the turquoise was exhausted in 1976.

Financial Dealings Between Taxpayer and Cities Service

55. Taxpayer did not receive funds from any source to recoup the cost of equipment, labor and other costs of mining, other than from the sale of turquoise and small sums from the sale of turquoise jewelry.

56. Taxpayer paid royalties to Cities Service based on the pounds and grade of turquoise mined.

57. Taxpayer paid no money, other than royalties, to Cities Service.

58. There was no agreement between taxpayer and Cities Service to share profits in the ultimate sale of turquoise.

59. Cities Service has not paid any money to Hardy.

60. Cities Service has not claimed a depletion deduction for the turquoise mining operations at the Miami mine, or for the royalty payments received from Hardy.

Turquoise Mining Operations

61. (a) The quality of turquoise, including color and hardness, varies substantially from one mine to another. Blue is more valuable than green and hard is more valuable than soft. Kingman turquoise, particularly the production from the Ithaca Peak portion of Kingman, tended to be bluer and thus more valuable than that produced at Miami.

(b) The cost of recovering turquoise, in any form, also varies from mine to mine, depending on the frequency of turquoise deposits and the geological characteristics of each particular mine.

(c) At the Miami mine, it was more difficult to remove turquoise from the ground. The deposits at the Miami mine contained less turquoise and there was more overburden to remove. The turquoise was located in rock which had to be blasted, causing fracturing and damage to the turquoise pieces.

(d) As a result of the greater difficulties in removing turquoise at Miami, the production costs and the rate of recovery of turquoise varied substantially between the two mines. Production costs were 50 percent higher at Miami than at Kingman for equal quantities of turquoise produced.

62. (a) Some of the mined turquoise, known as "natural" or "gem" turquoise, is sufficiently hard so that it is commercially marketable in its natural state without being treated.

(b) Approximately 95 percent of the turquoise taken by taxpayer from both mines was so-called "chalk turquoise." Chalk turquoise is not usually hard enough to be commercially marketable without first being treated to increase its hardness and deepen its color. After treatment, it is sometimes referred to as stabilized turquoise.

(c) In the years in question, taxpayer could not sell more than a very small quantity of the chalk turquoise mined by it, in its untreated state. The chalk could not be sold until it was stabilized. Chalk turquoise was less valuable than natural.

Amounts of Production

63. (a) In the years in question, taxpayer mined the following number of pounds of green (chalk), chalk (blue chalk), and gem (natural) turquoise at the Kingman (Duval) mine:

Kingman – 1972–1974

|      | Green | Chalk | Gem or natural | Total |
|------|-------|-------|------|-------|
| 1972 | 32,188 | 13,775 | 1,323 | 47,266 |
| 1973 | 23,878 | 54,818 | 4,344 | 83,040 |
| 1974 | 92,726 | 69,035 | 8,908 | 170,669 |

64. In 1973 and 1974, taxpayer mined the following number of pounds of low-grade (chalk), medium-grade (hard chalk) and high-grade (gem or natural) turquoise at the Miami (Cities Service) mine:

Miami – 1973–1974

|      | Low Grade | Medium Grade | High Grade | Total |
|------|-----------|--------------|------------|-------|
| 1973 | 17,714 | 6,761.5 | 2,758.5 | 27,234 |
| 1974 | 72,630 | 20,139.0 | 3,730.0 | 96,499 |

65. (a) The amount of natural turquoise and its percentage of the total taken from the two mines are as follows:

| | Kingman | | | | Miami | | |
|---|---|---|---|---|---|---|---|
| | Natural | Total Production | % of Nat. | | Natural | Total Production | % of Nat. |
| 1972 | 1,323 lbs | 47,266 lbs | 2.8% | | | | |
| 1973 | 4,344 lbs | 83,040 lbs | 5.2% | | 2,758.5 lbs | 27,234 lbs | 10.1% |
| 1974 | 8,908 lbs | 170,669 lbs | 5.2% | | 3,730.0 lbs | 96,499 lbs | 3.9% |
| Total | 14,575 lbs | 300,975 lbs | 4.8% | | 6,488.5 lbs | 123,733 lbs | 5.2% |

66. In 1973, natural turquoise represented 6.44 percent (7102.5 lbs of 110,274 lbs) of the taxpayer's total production from the two mines. For 1974, this figure was 4.73 percent (12,638 lbs of 267,168 lbs).

### Processing Operations

67. After the turquoise is taken out of the ground, most of it is separated into three separate piles, according to the description of turquoise set forth in the Duval and Cities Service contracts. The turquoise was also cleaned by taxpayer's employees so that no extraneous rock would remain in the material and be a part of the poundage upon which the royalty payments were computed.

68. All the turquoise mined by taxpayer was mixed as if from one source and delivered to the Kingman plant, approximately 18 to 20 miles from the Kingman mine, and approximately 250 to 300 miles from the Miami mine.

69. During 1973 and 1974, considerations of cost kept taxpayer from making efforts to keep the turquoise from the two mines separate at the plant. High-grade or natural turquoise was ordinarily kept separate without any problem. Low-grade or chalk turquoise from both mines was, however, mixed for processing and sale.

70. (a) The extensive treatment process for chalk turquoise from both mines began as soon as the material reached the Kingman plant. Costs for production of chalk turquoise were thus much greater than for natural turquoise.

(b) The process included drying, sorting, grading, chemical treatment, oven-drying, and polishing as well as additional sorting, grading, and cutting of the turquoise after chemical treatment.

71. (a) The chalk turquoise is first thoroughly dried, for a period of approximately 45 days.

(b) The drying process is monitored by taxpayer's employees to make sure that the material was ready for the next stage of the process.

(c) The drying process is an integral and necessary step in the treatment process for chalk turquoise. If the turquoise is not thoroughly dried, it is damaged in the remaining treatment process.

72. The turquoise is then sorted by hardness; different hardnesses require different combinations of processing agents. It is then placed in a mixture of several polyester resins, styrene, and a catalyst or hardener. The softer turquoise is placed in a thicker formula (containing relatively less styrene), while the harder turquoise is placed in a thinner formula (containing relatively more styrene). The turquoise remains in this bath for 2 to 4 weeks, depending on hardness. At this time, the turquoise begins to polymerize, or harden. The turquoise is then removed from the bath, wiped, and placed in a low heat oven, where it remains for several days.

73. Prior to the development of a new treatment process for chalk turquoise in late 1973, taxpayer was able to treat three times as much of the softer Kingman chalk turquoise as it could the harder Miami chalk turquoise.

74. During the years 1972, 1973 and 1974, taxpayer experienced approximately a 20 percent waste factor in preparing its natural turquoise production for sale. The

amount of actual wastage is not shown by the record. The depletion calculations made by taxpayer in its three returns were based on a 10 percent waste factor.

### Purchase of Turquoise

75. In each of the years in issue, Mr. Hardy for taxpayer made purchases of turquoise from third parties in Kingman, Arizona. Practically all the turquoise purchased by Mr. Hardy for taxpayer was natural turquoise.

76. Duval conducted inspections of its employees from time to time to see whether any turquoise was being removed illegally from the Kingman mine. Practically all of the turquoise discovered in these inspections was high-grade or gem quality turquoise.

77. No invoices concerning these purchasers were prepared by Hardy or any other employee of taxpayer. Only the total amount paid is available.

78. During the tax periods in suit the price paid for turquoise on the street at Kingman ranged from $5 to $15 per pound.

79. Depending on whether the prices were $5, $10, or $15 per pound, the possible amount (pounds) purchased for the period in suit ranges as follows.

|      | Amount Paid | lbs if $15 per lb | lbs if $10 per lb | lbs if $5 per lb |
|------|-------------|-------------------|-------------------|------------------|
| 1972 | $40,636     | 2,709.1           | 4,063.6           | 8,127.2          |
| 1973 | 29,250      | 1,950.0           | 2,925.0           | 5,850            |
| 1974 | 15,760      | 1,050.7           | 1,576.0           | 3,152            |

### Sales of Natural Turquoise

80. (a) There were no invoices available for 1972 of natural turquoise sold. In 1973 and 1974, taxpayer's employees prepared sales invoices to reflect the sales of its turquoise products.

(b) The invoices for 1973 and 1974 were available at trial. Invoices for 1972 were not available at the time of trial. Mr. Hardy did not know where such invoices were.

(c) Taxpayer's employees made some effort to record a description of each sale on its invoices for 1973 and 1974. Not all the invoices were marked with a description of the product sold. Plaintiff's accountant, Martinez, did not refer to these invoices in making his depletion calculation.

81. There was no breakdown of sales of turquoise in taxpayer's records as between the Kingman mine, the Miami mine and purchased turquoise for 1973 and 1974. Taxpayer did not maintain such records.

82. (a) For 1972, there are no invoices or other records to show how much natural turquoise was sold, what portion of the natural material sold was purchased by taxpayer, and how much came from the 1323 pounds extracted from the one mine in production in that year, and consequently how much of the sales were attributable to the mine.

(b) For 1973, the invoices available in taxpayer's records shows only that taxpayer sold 997.64 pounds of natural turquoise. There are no invoices or other records to show how much of these sales were of purchased turquoise, how much came from the 7,102.5 pounds (less the noted wastage) whose source was the two mines in production in that year, or, consequently, how much of the sales were attributable to each of the two mines in production.

(c) For 1974, taxpayer's records show that taxpayer sold 10,141.47 pounds of natural turquoise. There are no invoices or other records to show how much of these sales were of purchased turquoise, how much came from the 12,638 pounds (less the noted wastage) whose source was the two mines in production in that year, or, consequently, how much of the sales were attributable to each of the two mines in production in that year.

### Taxpayer's Records and the Testimony of Its Accountant

83. The records available and used by the taxpayer in its claim consisted of tax

returns for the years in question, a cash disbursements journal, a partial record of turquoise purchased, certain salary records, and royalty production records from Duval and Cities Service.

84. Walter A. Martinez, a certified public accountant, testified on behalf of taxpayer regarding the existence and condition of taxpayer's business records and the computation of the claimed deductions for depletion.

85. The original claims for refund were filed on March 10, 1976. The depletion deductions sought here were not claimed in taxpayer's original returns.

86. Martinez first worked for the taxpayer in December 1975, a year after the close of the last tax period in suit. At that time he was employed by taxpayer to do all its accounting work. Martinez's first work for taxpayer was the preparation of an unaudited financial statement and federal and Arizona tax returns for 1975.

87. (a) The amended claims were filed on April 14, 1976. Martinez prepared the calculation of the depletion deduction set forth in taxpayer's amended returns and the claims for refund for the years in issue.

(b) Martinez had little or no experience, prior to this suit, with clients who needed to have depletion computations made. His only previous depletion work had involved a simple percentage depletion calculation.

(c) Martinez's position is that he does not certify the accuracy of the claim in filing a claim for refund; that the tax return and claims are always representations of the client.

### The April 1976 Calculations

88. In preparing the April 1976 amended return depletion calculations for 1972 and 1973, Martinez relied on figures supplied by taxpayer's employees. He had doubts about the figures but did not check these figures out before using them in his calculations. His testimony that the calculations were made by unnamed employees of taxpayer is not accepted.

89. Martinez did not consult with Mr. and Mrs. Hardy as to the assumptions he made in his calculations, or in preparing the calculations upon which taxpayer bases its claim for refund. He believed that the Hardys could not give him much of an insight as to how to calculate the depletion deduction or how to base some of his assumptions.

90. (a) The sales figure for natural turquoise used in the April 1976 calculations was 20 percent of the gross sales figure. Martinez admitted that the 20 percent figure was a guess or estimate. He had questions about the figure. He did not have any firsthand knowledge whether it was correct or not.

(b) In these calculations for 1972 and 1973, Martinez used an 86 percent figure as the percentage of mining costs over total costs incurred by taxpayer. This figure was an estimate necessitated by a need to file the claims for refund promptly. He had some questions about the figure but because he had no better way of calculating the figure himself, he relied on taxpayer's personnel. The 86 percent figure was a figure the company had for 1975.

(c) Martinez testified that it was not an acceptable accounting practice to use this figure but that taxpayer was "under the gun at the time to get (the claims filed)." He thought the figure in the claims could always be amended later.

### The January 1979 Calculation

91. (a) In January 1979, Martinez attempted to redo his April 1976 depletion calculations. He was trying to arrive at "some more meaningful figures."

(b) He did not know at that time that a deduction for depletion could not be claimed with respect to purchased turquoise. He did not learn this until November 8, 1979.

(c) He did not know in April 1976 or January 1979 that the proportionate profits method, by which he calculated the depletion deduction, required separate calculations for separate mining properties such as the two mines here involved.

(d) He acknowledged that his trial testimony, to the effect that he knew prior to

September 26, 1979 that separate depletion calculations were required where a taxpayer was extracting minerals from two separate mineral properties, contradicted his deposition testimony, in which he indicated that before September 26, 1979, he thought that separate calculations were necessary only because of differences in transportation costs.

92. (a) Martinez prepared the depletion calculations on which taxpayer bases its claim for recovery between November 8, 1979, and the time of trial, December 7, 1979.

(b) Information was made available to Martinez by company employees, after he had prepared his January 1979 depletion calculations, concerning salary and production records from the two separate properties. His November 1979 calculations, just prior to trial, included this information.

(c) He did not attempt to incorporate separate calculations for each mining property into his work, until after November 8, 1979. The absence of separate records for the two mines prevented any such attempt.

The Calculations Relied Upon

93. Martinez gave contradictory answers as to whether or when he had ever consulted the regulations for the proportionate profits method. He was unsure of the regulatory basis for the proportionate profits method, and how the proportionate profits method calculations were to be performed. He overlooked the requirement of the Treasury Regulations § 1.614–1 and I.R.C. § 614(a) of separate depletion calculations when two mining properties were involved.

94. Martinez, assisted by plaintiff's counsel, made a number of assumptions of fact in preparing the calculations upon which taxpayer bases its claim for recovery. The reason was an absence of company records.

95. Taxpayer's cost of producing turquoise at Miami was significantly higher than at Kingman. In preparing his November 1979 calculations for 1973 and 1974, Martinez incorrectly assumed that the costs to produce a certain quantity of turquoise at Kingman and at Miami were the same.

96. (a) Martinez's depletion calculations used a price paid for turquoise not mined by taxpayer of $15 and a sale price of $40 per pound. Mr. Hardy testified the price paid was an average of $10. The prices paid varied during the periods in suit from about $5 to $15 per pound.

(b) Martinez assumed without inquiry that the turquoise purchased was chalk turquoise, and was bought for $15 per pound and sold for $40 and that there was no wastage. He did not ask Mr. Hardy or check out the figures. He relied on statements made by Mr. Hardy's former tax attorney. The turquoise purchased was in fact almost entirely natural turquoise, and other estimates in the record of the sale price of natural turquoise were $80–90 per pound.

Allocation of Expenses

97. Martinez, considering it a "monumental task," made no effort to allocate taxpayer's expenditures for supplies and services to the proper mining and nonmining categories.

98. (a) For 1972, 1973 and 1974, he allocated expenses recorded in taxpayer's cash disbursements journal between "mining, manufacturing, and unallocated" or "raw material inventory, manufacturing expense (and) general administrative expenses."

(b) He did not rely on the cash disbursements journal allocations because he did not believe the entries had been made correctly. Furthermore he did not believe he could rely on Mr. and Mrs. Hardy to determine whether the cash disbursements journal allocations were correct, because he felt they did not know enough about the company to assist in an invoice-by-invoice analysis. He did not inquire who made the cash disbursements journal entries. Nor did he conduct an independent survey to determine if the entries were correct or incorrect.

99. (a) Martinez recognized at trial that in preparing a calculation under the proportionate profits method (Treasury Regulations § 1.613–4(d)(4)), a taxpayer's costs, to be assigned between mining and nonmining

on the basis of the activity for which an actual expenditure is incurred, should be taken directly from a taxpayer's books and records and not assigned arbitrarily.

(b) Martinez had no direct knowledge regarding how taxpayer's various business costs should be allocated as between mining and nonmining. Consequently, he allocated these costs in a manner he thought or assumed to be reasonable under the circumstances.

### Estimates of Costs to be Allocated by Percentages

100. (a) Without any other basis to allocate taxpayer's "indirect costs not allocable to mining and nonmining," he allocated these costs between "nonmining" and "allocable to mining" by flat percentage figures. These were estimates without factual basis.

(b) The need to make such estimated allocations of taxpayer's business costs came from the fact that the taxpayer did not have sufficient records to provide a breakdown of costs.

(c) Martinez did not know whether the items identified as "shop supplies" in taxpayer's cash disbursements were mining or nonmining items. Consequently, he did not attempt to allocate these items and rather used a flat percentage 50–50 ratio between mining and nonmining on the assumption that it seemed reasonable. The assumption had no basis in fact. The related expense of "mining supplies" had already been entirely allocated by Martinez to the mining category column.

101. (a) Telephone costs, office supplies, shop supplies and insurance were allocated 50 percent to "nonmining" and 50 percent to "allocable to mining." Martinez did not attempt to learn where the company had telephones or the relationship of the other expenses to the mining operation.

(b) Costs allocated on about a 50–50 basis directly to "mining" and "nonmining" included utilities, legal and accounting, and directors' fees.

(c) Costs allocated 25 percent to "nonmining" and 75 percent to "allocable to mining" (and, thus, in effect, mining) included gas and oil, repairs, truck maintenance, and postage.

(d) Advertising was allocated 100 percent to mining.

(e) Freight was allocated 90 percent allocable to mining.

102. Martinez used information from the check disbursements journal for 1972, 1973 and 1974 to prepare the end-of-the-year totals found on the last page of each of his three depletion calculations, but did not use these journals to assign taxpayer's costs among direct mining costs, direct nonmining costs and indirect costs not allocable to mining or nonmining.

103. Martinez's allocation of taxpayer's 1973 and 1974 salary amounts between "mining, Kingman," and "mining, Miami," were based on figures provided by company personnel. His allocations to "sorting and grading" and "stabilization" were based on estimates, since there were not enough records to furnish an accurate breakdown.

104. (a) Martinez's 1973 and 1974 allocations of taxpayer's expenses between the two mines on the basis of taxpayer's production from those properties was a guess or estimate because the records were insufficient for an accurate allocation. Costs per unit of production were much higher at Miami than Kingman, a fact apparently unknown and not considered by Martinez at the time of his calculations.

(b) Martinez allocated many of taxpayer's 1973 business expenses between the Kingman and Miami mines on the basis of what he computed the production at those mines to be. The resulting ratio was 78.2 percent to Kingman and 21.8 percent to Miami. This allocation is in contrast to what Martinez believed was the actual allocation of salary amounts between the two properties. That ratio was 42.5 percent Kingman and 57.5 percent Miami. When questioned whether more mining expenses were incurred at the Kingman mine, Martinez responded "I don't know. The books don't break that down."

105. For 1974, Martinez listed Kingman "mining" salaries as $176,206.63 and Miami

"mining" salaries as $291,703.19. He got these figures from a company employee and did not check them. When he took these figures into his schedule, he transposed them. The effect of this error would be substantial if a claim for each property were made with its own costs and sales stated separately, in accordance with IRS regulations.

106. The turquoise of both mines was mixed and sold as if it were one. Mr. Martinez did not know whether the relative value of the turquoise from the two mines came into play in his calculations.

107. Martinez's allocation of the 1973 and 1974 expenses between "mining," "nonmining," and "allocable to mining" was not based on books or contemporary records but was the result of his untested estimates.

108. There was no reasonable basis in fact for these various flat percentage allocations, all of which were estimates necessitated by lack of records.

### Sales and Production

109. Taxpayer properly attempted to take costs attributable to the mined natural turquoise out of the costs formula, and to use only costs attributable to the treated turquoise in computing the proportionate profits percentage.

110. All indirect costs listed in the "allocable to mining" columns for 1972, 1973, and 1974 were allocated between natural and treated turquoise on the basis of sales of each instead of being allocated on the basis of production.

111. (a) In taxpayer's calculation for 1972, Schedule B, of the $38,233 in costs (from the "allocable to mining" column), $19,516 was allocated to natural turquoise and $18,717 to treated turquoise ((treated sales $199,212 ÷ $406,924, total sales, equalled .4896) × $38,233 = $18,717; $38,233 less $18,217 = $19,516).

(b) Thus, the calculation suggests that it cost taxpayer 36 or 37 times as much for gas and oil, taxes, telephone, repairs, advertising, etc., to process and sell its natural turquoise as it cost to process and sell its treated turquoise ($19,516 ÷ 1,323 lbs. of

natural extracted in 1972 = $14.75 per lb.; $18,717 ÷ 45,963 lbs. of chalk extracted in 1972 = $.40 per lb.; $14.75 ÷ .40 = 36.-875).

(c) In fact, natural turquoise did not need any substantial processing and the cost of utilities for natural and chalk turquoise was the same when considered by volume.

112. (a) Taxpayer also attempted to take costs attributable to the purchased turquoise out of the formula. In taxpayer's 1972 calculation, Schedule A, Martinez allocated his estimated nonmining costs between mined treated turquoise and purchased turquoise on the basis of sales. By basing the allocation on sales, rather than production, the result was that 36.08 percent (purchased turquoise sales, $108,363, plus jewelry sales $4,069, equal $112,432 ÷ $311,644 = .3608) of these costs were taken out of the "total cost" figure used to calculate the proportionate profits percentage.

(b) The effect of this calculation is that 36.08 percent of the costs estimated as "nonmining" costs were assigned to purchased turquoise and jewelry and the remainder, 63.92 percent, were assigned to treated turquoise.

(c) Thus, $23,642 of the $65,526 ($65,526 × .3608) in "nonmining costs" was allocated to what was believed to be 2,709 pounds of purchased turquoise plus some jewelry. Putting aside the jewelry, this calculation is to the effect that $8.73 per pound in nonmining costs ($23,642 ÷ 2,709) was associated with purchased turquoise while only $.94 per pound ($65,526 × .6592 = $43.195 ÷ 45,963 lbs, 1972 chalk production = $.94) was associated with treated turquoise. This allocation results in a considerable discrepancy in the costs associated with processing similar materials—purchased and extracted turquoise.

113. The effect of the above allocations was an impermissible ranking of costs. Treasury Regulations § 1.613–4(d) prohibits any allocation "which results in excluding or minimizing the effect of any costs incurred to produce, sell, and transport the first marketable product * * *." Martinez

admitted that he did not believe there was any relationship between sales for treated turquoise and the cost of production of that turquoise. His justification was that he believed it was reasonable, and that if taxpayer's records had been any better, he is sure he would have had a better justification for his assumptions.

114. Martinez and taxpayer's attorneys used the same factors and reasoning to prepare the 1973 and 1974 calculations as was used for 1972.

### Depreciation

115. (a) When Martinez first began to do accounting work for taxpayer, he learned that taxpayer had previously maintained depreciation schedules on which mining and manufacturing equipment were segregated.

(b) In preparing his calculations, however, Martinez did not use any such schedules, but rather estimated depreciation on the basis of taxpayer's production.

(c) His allocations of depreciation for buildings, furniture and fixtures, transportation equipment, and other machinery and equipment for 1973 and 1974 were based on assumptions, without consultation of available company records.

### Intermediate Conclusions of Law and Fact

116. Mr. Hardy's testimony is not accepted as reliable, on the grounds of his appearance and demeanor, his dealings with Duval's mine manager, and his 1977 conviction for income tax evasion.

117. The estimates and calculations made by taxpayer's accountant, appearing in the returns and relied upon at trial, were essentially guesses based upon insufficient records.

118. The testimony of taxpayer's accountant that the taxpayer's records were insufficient for better estimates is, on the entire record, accepted as credible and likely.

119. The proportionate profits method of calculating the depletion deduction which plaintiff was required to use and used, requires under the Treasury Regulations, (a) records of the dollar amount of expenses and sales of the mineral involved and (b) records of expenses and sales from each mine for which a depletion deduction is sought.

120. Plaintiff has not met its burden of proof for a depletion deduction in the tax year 1972 because of its inability by reason of an absence of records to show what portion of its sales of turquoise in 1972 came from its production in the one mine in production in that year, and what portion from purchases of the material from third persons, and its inability by the absence of records to show its mining costs and to properly allocate costs between mining and nonmining activities.

121. Plaintiff has not met its burden of proof for a depletion deduction in the tax years 1973 and 1974 because of its inability by reason of an absence of records to show actual sales of its natural and treated turquoise in 1973 and 1974 from each of its two mines in production and to show its mining costs in each of the two mines, and to properly allocate costs between mining and nonmining activities.

122. Taxpayer's records are insufficient from which to calculate a reasonable estimate of a depletion allowance for the years 1972 through 1974. Taxpayer has not met its burden of proof of a depletion allowance and deduction for the years in issue.

### CONCLUSION OF LAW

Upon the foregoing findings and opinion, the court concludes as a matter of law that the record contains insufficient reliable records or other evidence from which to calculate a reasonably accurate depletion allowance for taxpayer for the years 1972–1974, and that the taxpayer has therefore failed to meet its burden of proof. Plaintiff is not entitled to recover on its claim to a depletion deduction.

The parties having stipulated several other issues, the case is set down, failing agreement of the parties, for further proceedings on the amount of the judgment.